## COMMONWEALTH vs. JOHN L. HARTMAN, JR.

Middlesex. December 5, 1988. — March 13, 1989.

Present: HENNESSEY, C.J., ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Practice, Criminal,* Assistance of counsel, Continuance, Argument by prosecutor, Capital case.

There was no merit to a criminal defendant's contention that his motion for a new trial should have been granted on the ground that his trial attorney allegedly failed to explore evidence to undermine the Commonwealth's theory of the case. [312-313]

There was no merit to a criminal defendant's contention that his motion for a new trial should have been granted for his trial counsel's failure to adduce expert testimony on the defendant's diabetic condition on the day of the murder, where that evidence was before the jury in a hospital report and where, in any event, that evidence was not important to the defense of alibi. [313-314]

A criminal defendant did not establish that his trial counsel's failure to elicit testimony on the distance between the location of the murder and the defendant's home weakened his alibi defense so that his motion for a new trial should have been granted. [314-315]

In the circumstances of a murder trial, defense counsel's strategy of restricting his opening statement did not amount to ineffective assistance of counsel. [315]

In the circumstances of a murder trial there was no abuse of discretion in the judge's denial of the defendant's motion for a continuance to secure the attendance of a certain witness, nor had defense counsel acted unreasonably in his efforts to summon the witness. [315-316]

At a murder trial there was no error in the judge's exclusion of hearsay in a medical record in accordance with G. L. c. 233, § 79, and defense counsel's alleged failure to take other steps to secure the admission of the excised statements did not amount to ineffective assistance of counsel. [316-317]

Certain remarks made by the prosecutor in closing argument at a murder trial could not have been construed as an improper comment on the defendant's failure to testify. [317-318]

INDICTMENTS found and returned in the Superior Court Department on September 12, 1984.

The cases were tried before *Robert S. Prince,* J.

*Michael D. Cutler* for the defendant.

*Corinne Hirsch,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. Convicted of murder in the first degree, the defendant, John L. Hartman, Jr., appeals, alleging that his · trial counsel missed or bungled opportunities to present the case for the defense in the strongest possible light, that two rulings by the judge improperly restricted the defense, and that the prosecution made an impermissible comment on the defendant's failure to testify. The defendant concedes that none of these defects rises to the level of reversible error, but he argues that collectively the alleged errors undermine the integrity of the fact finding and the adversary process. The defendant concludes that the verdict lacks the appearance and substance of justice. The defendant asks us to exercise our power under G. L. c. 278, § 33E (1986 ed.), and grant him a new trial. The defendant also filed a motion for a new trial in this court. See note 11, *infra.* We affirm the conviction for murder in the first degree.[1] We discuss the merits of the motion for new trial in the opinion and deny the motion for new trial. We decline to exercise our power under G. L. c. 278, § 33E, in favor of the defendant.

The body of the victim was discovered at 5:45 P.M. on April 16, 1984, by her daughter, Doris DeSilva. When Mrs. Dunn

---

[1] The indictments charged larceny of $30 on April 15, 1984, as well as robbery, assault and battery, and murder on April 16, 1984. The judge instructed the jury on murder in the first degree, based on felony-murder or on deliberate premeditation. At the prosecutor's suggestion, there was no charge on extreme atrocity or cruelty. The jury found the defendant not guilty of larceny; guilty of murder in the first degree, based on both felony-murder and on deliberate premeditation; guilty of robbery; and guilty of assault and battery. The defendant bases his appeal on G. L. c. 278, § 33E, which applies only to the conviction for murder in the first degree. Any error in the other convictions, therefore, is deemed waived. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975); *Commonwealth* v. *Cundriff,* 382 Mass. 137, 150-151 n.22 (1980), cert. denied, 451 U.S. 973 (1981).

did not answer the door of her apartment in a housing complex for the elderly, DeSilva sought out Mary Spartichino, a neighbor of Mrs. Dunn and wife of the superintendent of the building, who kept keys to the other apartments. They unlocked the door to Mrs. Dunn's apartment[2] and found Mrs. Dunn lying face up on the floor with an opaque plastic garbage bag over her head, fastened tightly at the neck with electrical tape. Her hands were bloody, and there was blood on the edge of a small table next to the body on the floor. The apartment was otherwise in neat condition. In the kitchen there was a pot of soup on the stove with a clean, empty bowl on the counter, along with a teacup containing only a dry teabag. Mrs. Dunn ordinarily ate between 4 and 4:30 P.M. A wedding ring that Mrs. Dunn habitually wore and a plastic tote bag she habitually carried instead of a pocketbook were missing, and were not recovered.

The medical examiner opined that Mrs. Dunn had died of a lack of oxygen to the brain within thirty minutes to one hour of the time the bag was placed over her head. There was a blunt injury to the side of the head causing a fracture of the skull. Blood was still flowing from the nose and the right ear when the medical examiner saw the body. There were no other signs of violence on the body.

The defendant was at the victim's building, 50 Churchill Avenue, on the day before the murder. He visited his step-grandmother, who lived there, for about ten minutes late that morning. A neighbor saw the defendant at about 12 o'clock noon that day on the third floor of the building.

Another neighbor, Mrs. Helen Igo, who lived in an adjoining, connected building, 30 Churchill Avenue, spoke to the defendant on the day before the murder. Mrs. Igo said that

---

[2] The victim's door had both an ordinary lock and a deadbolt lock. The deadbolt lock can only be locked from inside, or from the outside with a key. DeSilva and Spartichino originally told the police that they had had to unlock both locks. DeSilva initially assumed that her mother had committed suicide, because the deadbolt was locked from the inside. However, at trial both DeSilva and Spartichino said that they had only had to unlock the ordinary lock, and that the deadbolt was not locked. The sliding glass doors leading to the porch were closed but unlocked. The apartment was on the third floor of the building.

the defendant used to come to the two connected buildings every Saturday to take orders from the elderly residents for food and cigarettes, which he was able to buy cheaply in New Hampshire. On the day before the murder, Mrs. Igo gave the defendant ten dollars for two cartons of cigarettes. At that time, Mrs. Igo also introduced the defendant to Mrs. Dunn and saw Mrs. Dunn give him some money.

On the day of the murder, the defendant was seen by the paper boy at about 8:30 A.M., and then again at 9:30 A.M. At 9:30 A.M. the defendant was propping open the front hall door of 30 Churchill Avenue so that it would not lock, and meanwhile was scanning the directory of names. The defendant also visited his stepgrandmother sometime before noon for about ten minutes.

The police interviewed the defendant at his home two days after the murder. State police Lt. Thomas Spartichino told the defendant that he was a suspect in Mrs. Dunn's death because the defendant had been at the building the day of the crime. Lt. Spartichino recited the Miranda warnings. See *Miranda* v. *Arizona*, 384 U.S. 436 (1966). The defendant then told Lt. Spartichino that he "didn't murder anybody." The defendant said that he had been on his way to the MBTA stop in Malden on the morning of the murder, intending to go to his stepgrandmother's house in Cambridge, when he met a man named John. John gave the defendant a ride to 50 Churchill Avenue in Cambridge. The defendant told Lt. Spartichino he was with his stepgrandmother there from about 10 A.M. to 10:15 A.M., during which time he asked his stepgrandmother about a key he might have lost there and about a broken chair. He also used the bathroom and tested his urine.[3] He then went home to Malden, arriving at about noon and remaining until 5 P.M. when he became ill and was transported to a hospital.

Lt. Spartichino told the defendant that the police were searching Mrs. Dunn's apartment for fingerprints, and he asked the

_____

[3] The defendant is diabetic. That fact appeared on a medical record entered in evidence and was mentioned by defense counsel in his summation. See notes 9 and 12, *infra*.

defendant if he had ever been in Mrs. Dunn's apartment. The defendant replied that he had; that approximately six to eight weeks previously he had seen Mrs. Dunn entering the building laden with two heavy grocery bags and that he had taken them from her and carried them up to her apartment for her. He said he also used her bathroom on that occasion. He told Lt. Spartichino that Mrs. Dunn offered him fifty cents but that he refused it. The defendant was able to describe the apartment, including the positions of the rooms, the furniture, and some pictures.

Mrs. Dunn's son Richard said that he owned a grocery store near his mother's home and that she shopped there frequently. He stated that Mrs. Dunn generally took small amounts of groceries home with her, but that if she needed a larger order it would be delivered, either by Richard Dunn or by one of his children, or else Mrs. DeSilva would pick it up.

The police fingerprint expert found a fingerprint on the plastic bag removed from Mrs. Dunn's head that matched a known fingerprint of the defendant. The print was inside the bag, approximately four inches from the opening.

According to Lt. Spartichino, the defendant admitted that he (the defendant) had taken $30 from Mrs. Dunn for a case of crabmeat the day before the murder, with no intention of ever delivering the goods. The defendant showed Lt. Spartichino a card which he said he had given Mrs. Dunn the day before the murder as a receipt for her thirty dollars. The card was a business card of a doctor, on the back of which Mrs. Dunn had written "Regina Dunn, Apartment 331" and "crabmeat." The defendant had written "$30." Lt. Spartichino related that the defendant repeated that he had not killed anybody, adding that he could not kill anybody, but that if there were a war he would get a Howitzer and kill everybody.

Sergeant Fidel Centrella was the Cambridge police officer in charge of the investigation. Centrella searched the defendant's apartment after his arrest. He found two boxes of "Glad" trash bags, similar in size and color (black on the inside, green on the outside) to the trash bag taped over Mrs. Dunn's head.

The defense attacked the prosecution's case in two ways. First, counsel for the defendant elicited testimony showing the possibility that Mrs. Dunn committed suicide.[4] Second, he established that the defendant was at his home in Malden at approximately 4:30 to 5 P.M. or shortly thereafter, and that he became ill and was taken to Malden Hospital. He was discharged from the hospital at 7 P.M. Crucial to the latter alibi was defense counsel's attempt, through cross-examination, to establish that death, and the assault that led to it, occurred late in the afternoon when the defendant could not have been in Cambridge.

The medical examiner made several different statements as to the time of death. First he testified that, based on the temperature of the body and of the room, he would estimate that Mrs. Dunn had been dead for "an hour, an hour and a half, two hours" when he examined her.[5] However, the medical examiner then stated that "when [he] saw her at 6:45 [P.M.], she had been dead for about three hours." He went on to state that in his opinion, death had occurred around 3 or 3:30 P.M.

On cross-examination, defense counsel tried to establish that the medical examiner had not examined the body immediately on his arrival, and in fact may not have begun to do so until 7:30 or 8:30 P.M. The medical examiner stated, however, that he examined the body at least preliminarily when he first arrived at 6:45, and that he took the body temperature at 7 P.M. Defense counsel brought out the information that the medical examiner had twice written on death certificates[6] that the hour of death was 5:45 P.M.

---

[4] The medical examiner stated that in his opinion Mrs. Dunn's death was not a suicide.

[5] The prosecutor picked up from this that Mrs. Dunn had been dead for one and a half to two hours, and the medical examiner agreed that that was as "exact as much as we make it."

[6] The medical examiner filed one death certificate on April 16, 1984, which stated "under investigation" in the blank for "immediate cause [of death]," and a second on May 8, 1984, giving as the immediate cause of death, "[a]sphyxia from plastic bag around her head."

1. *Standard of review.* As noted above, the defendant does not allege any actual errors in the conduct of the trial. Rather, he notes several "near errors," and argues that these, when taken together in the light of the (assertedly) minimally sufficient evidence against him, entitle him to a new trial in the interest of justice. We have considered the points raised by the defendant along with all the law and the evidence, pursuant to G. L. c. 278, § 33E, to determine whether there is a substantial likelihood of a miscarriage of justice, and to "search . . . for a result that may be 'more consonant with justice.' " *Commonwealth* v. *Cole,* 380 Mass. 30, 38 (1980), and cases cited. The statutory duty of review "does not, however, convert this court into a second jury." *Commonwealth* v. *Smith,* 357 Mass. 168, 181 (1970), quoting *Commonwealth* v. *Gricus,* 317 Mass. 403, 406 (1944).

2. *Ineffective assistance of counsel.* a. *Motive.* The defendant contends that defense counsel failed to explore evidence that would undermine the prosecution's case as to motive. He argues that defense counsel did not establish that the defendant had been running errands for Mrs. Dunn's neighbors for years without any allegations of fraud, nor did defense counsel bring out the unlikelihood of the defendant's giving a receipt to someone he intended to defraud. The defendant asserts that defense counsel's omissions left it open to the prosecution to paint a damaging picture of the defendant as one who came to the victim's building intending to prey on the elderly.

The defendant's affidavit, submitted in support of his motion for a new trial (see note 11, *infra*), argues that it is unlikely that a person would defraud people whom he sees regularly. Contrary to the defendant's assertions made in his motion for new trial, defense counsel did elicit helpful testimony from several neighbors of the victim.[7] In his summation, defense

---

[7] For example, Mrs. Dunn's neighbor, Mrs. Igo, stated that the defendant visited his stepgrandmother frequently, ran errands for her, and "was awfully good to her." The defendant's stepgrandmother said he visited her to bring her insulin and do errands, but he did not come every week. She also said that he came sometimes with his mother and the three of them sometimes went out to eat.

counsel argued in substance that, if the defendant were guilty, he would not have written down his transaction with Mrs. Dunn on a card and then voluntarily given it to the police. He also reminded the jurors that Mrs. Igo received her cigarettes. Thus, there was both testimony and argument to undermine the Commonwealth's theory and to create reasonable doubt.[8] The "review . . . prescribed by G. L. c. 278, § 33E, . . . is [not] intended to afford an opportunity . . . to attempt to convert the consequences of unsuccessful trial tactics and strategy into alleged errors by the judge" or defense counsel. *Commonwealth* v. *Johnson*, 374 Mass. 453, 465 (1978). The defendant's motion for a new trial on this ground is without merit.

b. *Insulin shock.* The defendant also argues that defense counsel's failure to adduce expert testimony on the defendant's diabetes permitted the prosecutor to suggest in her closing argument that the symptoms the defendant presented on admission to the hospital on the evening of the murder (anxiety, confusion, moist skin, shakiness, faintness) were due to "what he had just done at Mrs. Dunn's apartment." The admission record from Malden Hospital was redacted to exclude certain statements of the defendant (see note 12, *infra*). The defendant argues that defense counsel could have elicited from Dr. Lindquist, the admitting emergency room physician, that the defendant's symptoms were typical of an insulin reaction[9] and

---

[8] In fact, the jury acquitted the defendant of larceny of $30. See note 1, *supra*.

[9] The defendant filed a motion in conjunction with his pending motion for a new trial (see note 11, *infra*), asking that we take judicial notice of the symptoms of "insulin shock" or "insulin reaction" as described in a medical dictionary. The defendant states, in support of his motion, that the symptoms of insulin shock are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Proposed Mass. R. Evid. 201. Neither party has suggested or argued that we adopt the proposed rule. We therefore do not discuss the proposed rule.

Judicial notice is appropriate for matters of common knowledge. *Brown* v. *Piper*, 91 U.S. 37, 42-43 (1875). "Facts which ordinarily are not known without the aid of expert testimony or other proof cannot be said to be matters of common knowledge." *Mady* v. *Holy Trinity Roman Catholic Polish Church*, 223 Mass. 23, 26 (1916). See P.J. Liacos, Massachusetts

that she had treated him for similar symptoms in the past. There is no affidavit to confirm that Dr. Lindquist was prepared to testify to these facts. Further, we cannot agree with the defendant's contention that such evidence was important to the alibi defense. The main importance of the hospital admission was to establish the defendant's whereabouts at the time the crime might have been committed. That fact was firmly established by the testimony of the doctor, the ambulance attendants, and the defendant's neighbor who saw the defendant's collapse. Further, the facts that the defendant suffered from diabetes, and that the emergency room doctor diagnosed an insulin reaction, appear on the admission record that went to the jury. While it might have been possible to adduce further evidence on the nature of the defendant's illness, the most important aspect of the evidence — the timing — was adequately brought out.

c. *Alibi*. The defendant also asserts that trial counsel failed to elicit testimony on the distance between Malden and Cambridge. The defendant states in his affidavit that travel between the defendant's Malden home and Mrs. Dunn's apartment in Cambridge takes thirty minutes by automobile or ninety minutes by public bus. Assuming the truth of the affidavit, and that the defendant had no access to an automobile, he could have been in Cambridge as late as 3 P.M. and still been in Malden at 4:30 P.M., the earliest time at which a witness says she may have seen him. If he did have access to an automobile, he could have left Cambridge at 4 P.M. and arrived in Malden by 4:30 P.M. The medical examiner placed the time of death at 3 to 3:30 P.M. and estimated that the attack took place one-half hour to one hour before death, i.e., between 2 and 3 P.M. Thus, if the jury believed the early time of death to

---

Evidence 18-19, 29-34 (5th ed. 1981). The symptoms of insulin shock are not matters of common knowledge, nor do they fall into any of the other categories for which judicial notice is appropriate. See *Brown* v. *Piper*, *supra*; P.J. Liacos, *supra*. Therefore, the definition offered by the defendant is not a proper subject for judicial notice. See *Weinberg* v. *Massachusetts Bay Transp. Auth.*, 348 Mass. 669, 671 (1965); compare *Mistal* v. *Mistal*, 315 Mass. 308, 310 (1943). Accordingly, the motion asking that we take judicial notice of this medical definition is denied.

which the medical examiner testified, testimony concerning the distance between Malden and Cambridge would not have helped the defendant. If, on the other hand, the jury accepted defense counsel's suggestion that the time of death was 5:45 P.M., meaning the attack took place around 4:45 to 5:15 P.M., the alibi would have been established without the testimony concerning the distance between Cambridge and Malden. The defendant's case was therefore not weakened by the lack of testimony on the point.

d. *Opening statement.* Finally, the defendant argues that trial counsel's perfunctory opening statement wasted an opportunity to make a dramatic impression on the jury. The defendant concedes in his brief, and we agree, that this judgment "undeniably benefits from the clear illumination of hindsight."

In short, defense counsel's trial strategy does not show "serious incompetency, inefficiency, or inattention of counsel — behavior . . . falling measurably below that which might be expected from an ordinary fallible lawyer . . . [that] has likely deprived the defendant of an otherwise available, substantial ground of defen[s]e." *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974). Cf. *Commonwealth* v. *Street,* 388 Mass. 281, 285 (1983); *Commonwealth* v. *Westmoreland,* 388 Mass. 269, 271-275 (1983). The defendant's claim of ineffective assistance of counsel is meritless.

3. *Erroneously excluded evidence.*[10] The defendant alleges that defense counsel took inadequate steps to assure the appearance of a witness who could attest to the defendant's presence in Malden on the afternoon of the murder. The witness came to court to testify but was not called that day. After he left, defense counsel tried to summon him, but found that he had left to work in New Hampshire. The trial judge denied the defendant's motion for a continuance. "Whether a motion for continuance should be granted lies within the sound discretion of the judge, whose action will not be disturbed unless there is a patent abuse of discretion." *Commonwealth* v. *Funderberg,*

---

[10] The defendant lays the blame for this "near error" on defense counsel equally with the trial judge.

374 Mass. 577, 580 (1978), and cases cited. Even on the basis of the offer of proof, there was scant reason to grant a continuance, as trial counsel said the witness was "not sure" he could place the defendant in Malden between 3 and 6 P.M. The witness's affidavit, submitted with the defendant's motion for a new trial,[11] makes it clear he did not claim to have seen the defendant before 5 or 5:30 P.M. on the afternoon of the murder. There was no abuse of discretion in denying the continuance, nor can we say that "trial counsel unreasonably ignored a plausible . . . . defense." *Osborne* v. *Commonwealth*, 378 Mass. 104, 111 (1979).

The defendant also alleges that it was error for the Malden Hospital emergency room records to be "sanitized" to remove the defendant's self-diagnosis.[12] Initially, it was the defendant himself who offered the record in evidence. When the judge evinced his intention to redact the record, the defendant withdrew his offer of evidence, but he later re-offered it, reiterating his objection to the redaction.

The redaction appears to have been carried out in accordance with G. L. c. 233, § 79. The statute operates as an exception to the hearsay rule, permitting "admission of the substantive content of hospital records because of the presumption of reliability which attaches to statements relating to treatment and medical history in these records." *Bouchie* v. *Murray*, 376 Mass. 524, 527-528 (1978). "Hence entries made in the regular

---

[11] The defendant filed motions with this court for stay of appeal and for a new trial, based on the claim that the testimony of this alibi witness was essential to his case, and that the failure to ensure the witness's testimony amounted to ineffective assistance of counsel. The full court referred the matter to a single justice, who dismissed the motion for stay of appeal because the defendant took no action on the motion and failed to make timely filing of the affidavits. The single justice referred the motion for a new trial to the quorum. The affidavit of the witness, submitted with the appellate briefs, reveals that the witness's testimony as to the time the defendant was seen in Malden was similar to that of other impartial witnesses.

[12] The excised portions of the record read as follows: "Pt. sts [Patient states] insulin reaction" and "Malaise yesterday. Today — took his insulin, but ate only a small breakfast & nothing else since. Became weak & sweaty this afternoon."

course of the institution's operation from the personal knowledge of the recorder or from a compilation of the personal knowledge of those who have an obligation in the course of their employment to transmit that medical information to the recorder are admissible under the exception. Any other statements in the record which relate to treatment and medical history and which are offered for the truth of the matter contained therein must fall within some other exception to the hearsay rule in order to be admissible." *Id.* at 528-529. The excised statements thus are not admissible under G. L. c. 233, § 79, nor has the defendant referred us to any other exception to the hearsay rule that covers them. There was no error either on the part of the trial judge in excluding the hearsay portions of the records, or on the part of counsel in failing to take other steps to save the evidence.

4. *The prosecutor's improper remark.* The defendant takes exception to a remark made by the prosecutor in her final argument. The prosecutor told the jury that when the police interrogated the defendant, two days after the murder, they had not yet spoken to the paper boy who had seen him at Mrs. Dunn's building on the day of the crime. Therefore, the police "didn't know what [the paper boy] was going to say. So, I suggest to you, they couldn't bring it up to the defendant. The question was never presented to the defendant to explain that." The defendant argues that this comment invited an adverse inference from the defendant's refusal to testify, as is his right. We cannot agree.

"[U]nless a prosecutor's comments are of such a nature that a jury would naturally and necessarily construe them to be directed to the failure of the defendant to testify, they are not prejudicially unfair." *Commonwealth* v. *Smallwood,* 379 Mass. 878, 892 (1980), quoting *United States* v. *Armedo-Sarmiento,* 545 F.2d 785, 793 (2d Cir. 1976), cert. denied, 430 U.S. 917 (1977). See *Commonwealth* v. *Kozec,* 399 Mass. 514 (1987). It is clear that the context of the prosecutor's remarks was the police interrogation, during which the defendant did not exercise his right to remain silent. She was alluding to the failure of the police to ask a particular question, not the failure of the

defendant to answer. It would be neither natural nor necessary to construe the remark as a comment on the defendant's failure to testify. There was no reversible error.

In sum, we agree with the defendant that there was no error in the trial as such. We do not agree that the evidence was only marginally sufficient to sustain a conviction, nor that the integrity of the process was, or even appeared to be, deficient. Thus, there is no reversible error at trial. On the basis of the affidavits filed with the motion for new trial, we decline to order a new trial. Pursuant to our duty under G. L. c. 278, § 33E, we have reviewed the entire case "in a large or nontechnical sense." *Commonwealth* v. *Davis*, 403 Mass. 575, 585 (1988). We conclude that the interests of justice do not require either a new trial or entry of a verdict of a lesser degree of guilt.

*Judgments affirmed.*