COMMONWEALTH *vs.* REGINALD BLY. No. 89-P-365. July 23, 1990. *Robbery. Error*, Harmless. *Practice, Criminal*, Fair trial.

Around midnight of May 24, 1987, Linwood McManus (the victim), a gay man in his fifties, walking homeward after dinner with a friend, stopped at Harriet Tubman Park, located at the junction of Warren and Columbus Avenues in the South End district of Boston. The park was a cruising area for homosexuals. The victim was approached by the defendant. There was some talk. The defendant said he was Donald, nineteen years old. He accompanied the victim to the latter's apartment at 11 Concord Square, a short distance from the park. Here the victim performed fellatio upon the defendant. The victim became apprehensive when it appeared to him that the defendant was not responding as a gay man would be expected to do.

After conversation that aggravated the victim's uneasiness, the defendant asked the victim for his telephone number "in case I want to get in touch with you again." The victim was too fearful to refuse, and as the defendant was standing in sight of the number inscribed on the telephone instrument, the victim thought he must give the correct number. He wrote the number, with the name "Leonard" not Linwood, on the top page of a pad of paper nearby. He tore off the part of the page on which he had written and handed it to the defendant, leaving the rest of the paper attached to the pad.

---

[5]Probably on the basis of an outdated record. The parents had occupied the trailer until sometime in 1981.

At this point the defendant said, "I want some money." The victim demurred briefly but then gave the defendant ten dollars. The defendant reached through an opening to the kitchen, seized two carving knives, waved these in front of the victim, and said, "I want all your money. And I want your jewelry, too." The victim emptied his pockets of twenty dollars and took off his gold chain necklace and gold signet ring. The defendant said, "Man, you're going to pay for what you did . . . . I'm only fifteen years old, and you're going to pay." After expostulations on the defendant's part, and mollifying words on the victim's, the defendant took up his gains, and, leaving the apartment, said, "[M]y name ain't Don. My name is Duane Johnson and don't you fucking forget it." The victim decided not to call the police.

Next day about 5 P.M. the defendant telephoned: "[I]s Leonard there?" The victim said there was no one by that name. "Leonard, it's you . . . . I'm coming over there to get you, and I'm coming over with the police." The victim said wrong number and hung up.

Ten minutes later, the victim heard the buzzers in all the apartments being rung, and, going to the window, he saw three young men standing on the stoop. The victim called 911 and within two or three minutes a police cruiser pulled up. The victim heard an officer tell the men to get into the cruiser. They did. Another officer met the victim briefly, both went downstairs to the cruiser, and the victim made a positive identification of one of the men, the defendant, as the assailant of the night before. The defendant was placed under arrest and given the Miranda warnings. A search of his pockets turned up a piece of paper with "Leonard" and the telephone number. This piece fitted exactly the rest of the page on the pad.

Upon the defendant's trial in Superior Court for armed robbery (he was actually aged eighteen at the time of the offense), the foregoing, in substance, was the Commonwealth's case, and a jury could well accept it. The defense presented weak alibi testimony by the defendant and his mother and brother. The defendant said he and the two others were out walking near 11 Concord Square on the afternoon of May 25 and were led to that place by an officer. As to the piece of paper, the defendant said it was not taken from him but was brought down from the victim's apartment by an officer.

The jury found the defendant guilty of the crime charged and the present appeal is from the judgment of conviction.

The defendant bases his appeal on sundry happenings during trial. We examine these seriatim.

1. The victim testified that he observed small scars on the crown of the defendant's head. The prosecutor asked the judge to direct the defendant to exhibit his head to the jury. Instead of giving the direction, as he could have done (the demonstration was nontestimonial and bore on identification), see *Commonwealth* v. *Brennan*, 386 Mass. 772, 776 (1982); *Commonwealth* v. *Kater*, 388 Mass. 519, 532-533 (1983), the judge said, and

informed the jury, that the defendant could choose whether to show himself or not. The defense objected and the defendant remained seated. It might be thought that the judge's ruling was easier on the defendant than the correct one would have been. At all events, at a later stage of the case, the defendant, after voluntarily exposing his knee, showing scars,[1] exhibited his head at the prosecutor's request, raising no objection. So the problem washes out.

2. There is argument that the prosecutor was permitted to use the defendant's postarrest silences improperly against him. For the principle, see *Commonwealth* v. *Cobb*, 374 Mass. 514, 520-521 (1978).

(a) During the direct examination of Officer John Watts, he was asked, "[D]id the defendant say anything when he was identified?" (We may take it that the defendant, when "detained" in the cruiser, was in effect under arrest, see *Commonwealth* v. *Haas*, 373 Mass. 545, 552-554 [1977].) Answer: "He was mumbling something, but I don't remember the words. . . ." Later Watts said the expression on the defendant's face was "Who, me?" This seems exculpatory as far as it goes. Again, Watts was asked, "Did the defendant make any statement concerning why he was at 11 Concord Square"? Answer: "I can't recall. . . ."; later, Watts said he hadn't asked the defendant why he was there. Cf. *Commonwealth* v. *Hackman*, 404 Mass. 306, 317-318 (1989). No objection was taken in either instance and there is little ground left for a grievance, let alone for claiming a violation of a "manifest injustice" standard.

(b) There was objection when the prosecutor asked Officer Kieran Fitzgerald to read out the Miranda rights he had read to the defendant at the scene. From a colloquy at the bench it appeared that this was intended as a preface to a question that might have been objectionable, but it was not asked. Of itself, the request for the reading could hardly be called damaging to the defendant.

(c) To return to Officer Watts, he testified to the retrieval of the piece of paper, and was then asked, "[D]id the defendant say anything when you found that on him?" Over objection, Watts answered, "I can't recall." The question was improper and should have been excluded. However, the answer was bland. And following the next episode (d), the judge gave a corrective instruction which applied as well to the present.

(d) Officer Fitzgerald was left with the defendant when Watts went upstairs to fetch the victim. The prosecutor asked Fitzgerald, "And just a yes or no question, . . . did you have any conversation with the defendant at that time?" Answer: "Yes, I did." The prosecutor persisted, "During your conversation, did the defendant ever deny being at 11 Concord Square — yes or no"? Upon objection, the judge excluded the question. Prejudice may be minimized or absent where the improper question is left unan-

---

[1]The defense was making the point that the victim would have observed the knee scars (and testified to them) if this indeed was the guilty man.

914           29 Mass. App. Ct.

Rescript Opinions.

swered. See *Commonwealth v. Burke*, 373 Mass. 569, 574 (1977). Turning to the jury, the judge instructed that once arrested, an accused was "under no obligation to respond to any question, or say anything, or deny anything, or admit anything, or offer anything at all; and no unfavorable inference can be drawn from his taking that position if he does."

3. The defendant's mother, Odessa, testifying to an alibi, said she was aware of a prior hearing in the case and was then asked, "[W]hy didn't you come and testify for him then?" She replied that she wasn't asked to come. Defense counsel objected that the question was "a blatant comment on Mr. Bly's not calling witnesses, which he is not responsible to do"; counsel then moved for a mistrial (denied). The question was out of bounds under G. L. c. 278, § 23, which, as we said in *Commonwealth v. Sherick*, 23 Mass. App. Ct. 338, 342 n.5 (1987), "has in effect been largely if not altogether overtaken by . . . [constitutional] guarantees." Here the judge gave a pointed instruction that "no defendant is under any obligation to call any witnesses or testify himself or raise any defenses whatsoever. . . ." He spoke, too, of the many innocent reasons a defendant might have for omitting to call a given person to testify at a preliminary or other hearing. This matter was not again referred to and, we think, could play little part with an intelligent jury. See *Commonwealth v. Maguire*, 375 Mass. 768, 774-775 (1978); *Commonwealth v. Stokes*, 10 Mass. App. Ct. 434, 437-438 (1980). Cf. *Commonwealth v. Cancel*, 394 Mass. 567, 575-576 (1985).

We see here a prosecutor whose somewhat excessive zeal — noted by the judge — seems to have made him impervious to the meaning of the objections that were being taken. However, in the end, as indicated, there was no material impairment of the defendant's right to a fair trial. Moreover we are to recall that in considering whether improprieties at trial warrant reversing a conviction, we may pay attention, among other factors, to the strength of the substantive case against the defendant. See *Commonwealth v. Mahdi*, 388 Mass. 679, 696-697 & n.18 (1983). Here the piece of paper was telltale; the case was very strong.

*Judgment affirmed.*

*John P. Moss, Jr.*, for the defendant.
*Daniel M. Marposon*, Assistant District Attorney, for the Commonwealth.