COMMONWEALTH vs. GREGORY J. MARTINO.

Hampden. December 2, 1991. - March 19, 1992.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & GREANEY, JJ.

*Homicide. Constitutional Law,* Search and seizure. *Search and Seizure,*
Consent, Exigent circumstances, Affidavit. *Practice, Criminal,* Indict-
ment, Grand jury proceedings, Mistrial, Argument by prosecutor, De-
liberation of jury, Examination of jurors, Presence of defendant, Assis-
tance of counsel, Capital case. *Evidence,* Prior misconduct. *Jury and
Jurors.*

At a murder trial, the evidence, which was largely circumstantial, was suf-
ficient to satisfy a jury of each element of murder in the first degree
beyond a reasonable doubt. [271-273]

The record of the hearing on a criminal defendant's suppression motion
warranted the judge in finding that the defendant's consent to question-
ing by police, to the search of his van, and to delivering articles of his
clothing to police was voluntary. [273-275]

At a pretrial suppression hearing, the judge correctly concluded that exi-
gent circumstances justified a police officer in seizing without a warrant
certain items which the defendant's attorney was carrying out of de-
fendant's house at a time when the house was under police surveillance,
but before a warrant to search the house had been issued. [275-277]

Where a criminal defendant failed to make a sufficient preliminary show-
ing that a police officer's false statement in a search warrant affidavit
had been intentionally, knowingly, or recklessly made, the defendant
was not entitled to a hearing under principles discussed in *Franks* v.
*Delaware,* 438 U.S. 154 (1978), to challenge the validity of the war-
rant. [277-278]

A police officer's misstatement in his grand jury testimony did not require
dismissal of a murder indictment in the absence of any showing that
the statement was intentionally or recklessly made. [278-279]

At a murder trial, the judge properly permitted several witnesses to testify
concerning the deterioration of the defendant's relationship with the
victim. [279-281]

At a murder trial, the judge's prompt, forceful curative instruction was an
adequate response to a witness's spontaneous remark, and the judge
properly exercised her discretion in denying the defendant's motion for
a mistrial. [281-282]

At a criminal trial, the prosecutor was entitled to comment in closing ar-
gument on evidence of differences between the defendant's pretrial
statement and his trial testimony, and also, in view of the detail of the
defendant's pretrial statement, to argue that omissions from the state-
ment evinced consciousness of guilt. [282-284]

Although a criminal defendant's constitutional rights of confrontation and
to a fair trial gave rise to a requirement that both he and his attorney
be present during a colloquy leading to the judge's discharge of a delib-
erating juror, the circumstances of the defendant's absence from the
colloquy did not necessitate reversal of his murder conviction, where the
record unequivocally showed that the defendant was fully informed of
everything that occurred; his attorney made no objection to the proce-
dure followed by the judge; the defendant, through his attorney, was
given sufficient opportunity to evaluate and respond to the problem; and
the defendant's attorney indicated that the defendant agreed to the ju-
ror's discharge. [284-287]

On appeal from a first degree murder conviction, the defendant did not
demonstrate that his trial counsel was ineffective in that he failed to
object to the defendant's absence during examination of a juror who
was discharged [288], to accept the judge's offer of a jury instruction
on manslaughter based on intoxication [288], to request a jury instruc-
tion that mere presence at the scene of a crime is insufficient to warrant
conviction [288-289], or to recognize that a defense witness would give
testimony favorable to the Commonwealth on cross-examination [289].

A defendant convicted of first degree murder presented no ground for re-
lief under G. L. c. 278, § 33E. [289-290]

INDICTMENT found and returned in the Superior Court De-
partment on September 30, 1987.

Pretrial motions were heard by *Constance M. Sweeney*, J.,
and the case was tried before her.

*Peter J. Avenia* for the defendant.

*Ariane D. Vuono*, Assistant District Attorney, for the
Commonwealth.

GREANEY, J. A jury in the Superior Court found the de-
fendant guilty of murder in the first degree by reason of de-
liberate premeditation and extreme atrocity or cruelty in
connection with the strangulation of his former girl friend.[1]

---

[1]The defendant filed a motion to change the trial's venue which was
allowed. The trial took place in the Superior Court in Hampden County.

Represented by new counsel on appeal, the defendant argues a variety of issues. We reject his arguments and discern no basis to grant relief pursuant to G. L. c. 278, § 33E (1990 ed.). Accordingly, we affirm the judgment convicting the defendant of murder in the first degree.

The evidence, viewed in the light most favorable to the Commonwealth, *Commonwealth* v. *Anderson*, 396 Mass. 306, 311 (1985), permitted the jury to find the following facts. Approximately six months before the murder, the defendant and the victim, Vivian A. Morrissey, met and became romantically involved to the point where the defendant eventually moved in with the victim and her two children. After the defendant moved in, his relationship with the victim deteriorated. On one occasion, an argument between the defendant and the victim over possession of a videotape[2] escalated into a shoving match in which each tore the other's shirt. Eventually, the defendant moved out. Thereafter, the defendant and the victim stayed in contact with one another, but they continued to have difficulties. In particular, the defendant became upset that the victim had begun dating another man. The victim was also concerned because the defendant would not return his keys to her home, and she asked her estranged husband to change the locks on her house. This was done. She also obtained an unlisted telephone number. On September 14, 1987, the victim was granted a restraining order against the defendant. He then obtained a similar order against her. A few days later they agreed to "drop the orders."

On the day of the murder, September 21, 1987, the victim made a telephone call to the defendant at approximately 3:30 P.M. The defendant told her that he had a visitor and asked her to call him back in fifteen minutes, which she did. The defendant recorded this second telephone conversation on a videotape. During the conversation, the victim expressed con-

[2]The defendant testified that the videotape in question depicted himself and the victim having sexual intercourse. Several witnesses testified that the victim had destroyed this videotape.

cern about a number of repairs her house required, and the defendant offered to help her with some of the repairs. The victim also asked whether she could borrow the defendant's typewriter. They arranged for the defendant to visit the victim and her children at approximately 6 P.M. The defendant arrived at approximately 6:30 P.M. and left at some time after 8:30 P.M. He then drove to a tavern in Greenfield to watch a "Monday Night Football" game on television. Several witnesses, including a bartender, saw the defendant at the tavern at some time during the first half of the football game. The game started at 9 P.M., and its second half began at approximately 11 P.M.

The next morning, a regular babysitter for the victim's children (who was also a friend of the victim) arrived at the victim's home. This friend knocked on the back door but no one answered. She could hear the children inside the house and let herself in with a key the victim had given her. The friend fed the children in the kitchen, and noticed a note to the victim from the defendant.[3] Concerned that the victim had apparently left the children alone, the friend made contact with another babysitter who came to house. Sometime after this babysitter arrived, the victim's body was discovered in the basement and help was promptly called.

Officer Raymond Zukowski of the Greenfield police arrived at the victim's home at about 7:40 A.M. Sergeant Norman Roberts of the Massachusetts State police arrived next and went to the basement. He saw a sheet of yellow-lined paper under the victim's right knee. The sheet of paper had a shoe print on one side and the words "I love you Geg [sic]" on the other side. The words were written in the defendant's handwriting; the shoe print matched the sole of a sneaker owned by the defendant. There was also a pile of wood in the basement near where the body was found, and wood splinters

---

[3]The note read as follows: "Dear Viv, I know you're depressed about all the things to do around the house. I know you have many things to do. Don't let it get you down. I still care for you and lately you have done so much for me, making love the other night and going out. I love you as a friend. Take care, see you later this week, love Greg."

were discovered on the shirt and pants the defendant had worn on the night of the murder. A third note was taken by the police from the defendant's van which read as follows: "I really don't know how to start this. I never wanted or planned to hurt you, it was the farthest thing from my mind, believe me, I do love you, why I'm not showing it anymore, I guess because I . . . ."

The county medical examiner was the next person to arrive. He pronounced the victim dead by strangulation and examined her body. He found three distinct ligature marks on the victim's neck and found a length of rope near the body. This piece of rope was similar to several other lengths of rope discovered by the police at the defendant's home.

Based on the fact that the victim's body was in full rigor, the medical examiner determined that the victim had died approximately twelve hours prior to his examination of her body. A second medical examiner (who was also a pathologist) came to the scene at approximately 10:30 A.M. This physician also estimated that the victim had died twelve to fourteen hours earlier. Further investigation by forensics personnel assigned to the case recovered three hairs from the victim's body. One hair, found in the victim's mouth, was very similar to hair samples taken from the defendant.

1. *Sufficiency of the evidence.* The defendant argues that at least one of his motions for a required finding of not guilty, which were filed at the conclusion of the Commonwealth's case and at the conclusion of all of the evidence, should have been allowed. He urges that the Commonwealth's case is intrinsically so weak that his conviction rests on nothing more than speculation. The defendant particularly emphasizes his careful refutation of the evidence presented in the Commonwealth's case, maintaining that, at best, the prosecution succeeded only in pointing a finger of suspicion at him.

In reviewing the judge's decision to deny the defendant's motions for a required finding of not guilty, we inquire whether the evidence, considered in the light most favorable to the Commonwealth, was sufficient to satisfy a reasonable

jury of each element of first degree murder beyond a reasonable doubt. *Commonwealth* v. *Anderson*, 396 Mass. 306, 311 (1985). A conviction may be properly based entirely on circumstantial evidence so long as that evidence establishes the defendant's guilt beyond a reasonable doubt. *Commonwealth* v. *Nardone*, 406 Mass. 123, 129 (1989). *Commonwealth* v. *Montecalvo*, 367 Mass. 46, 54 (1975).

The prosecution introduced sufficient evidence of the defendant's guilt under these standards. There was no physical or scientific evidence to warrant a finding that the victim had committed suicide. The Commonwealth established both motive and opportunity on the part of the defendant. The defendant acknowledged that he and the victim had fought shortly before the murder and that he was upset because the victim had begun seeing another man. The defendant admitted having been present at the victim's home about the time at which expert medical testimony estimated the murder to have occurred. A note in the defendant's handwriting, and bearing his footprint, was found partially under the victim's body, and other notes written by him could be found to have incriminatory tones. A hair found in the victim's mouth was similar to samples of the defendant's hair. Wood splinters were found on the sleeves of the jacket the defendant wore on the night of the murder, and there was a stack of wood in the basement of the victim's house, near where the body was discovered.

In cases in which the evidence is largely circumstantial, "it is not essential that the inferences drawn should be the only necessary inferences . . . . It is enough that [the inferences] be reasonable and possible." *Commonwealth* v. *Merrick*, 255 Mass. 510, 514 (1926). "To the extent that conflicting inferences are possible from the evidence, 'it is for the jury to determine where the truth lies.'" *Commonwealth* v. *Wilborne*, 382 Mass. 241, 245 (1981), quoting *Commonwealth* v. *Amazeen*, 375 Mass. 73, 81 (1978). The defendant's arguments are in substance directed toward the weight and credibility of the evidence, a matter wholly within the province of the jury. See *Commonwealth* v. *Nardone, supra*

at 129-130; *Commonwealth* v. *Montecalvo, supra* at 54. Further, the Commonwealth's position as to proof had not deteriorated at the close of all the evidence. The judge properly denied the defendant's motions for a required finding of not guilty.

2. *Pretrial motions.* The defendant filed several motions to suppress evidence obtained in connection with his interrogation and arrest, from the search of his house and van, and from his trial counsel. The defendant also filed a motion seeking an evidentiary hearing under the principles discussed in *Franks* v. *Delaware*, 438 U.S. 154 (1978), asserting that a false statement had been knowingly, intentionally, or recklessly made by the police in an affidavit filed in support of the application for a search warrant for his house. Finally, the defendant moved to dismiss the indictment on the ground that the integrity of the grand jury had been impaired.

The judge held an evidentiary hearing on these motions. The judge's denial of the defendant's motions was accompanied by a very comprehensive and scholarly memorandum of decision. The subsidiary findings of fact made by the judge are fully supported by the evidence she found credible, and we accept them. We proceed to discuss the defendant's legal issues raised on appeal in connection with the motions in light of the judge's findings of fact.

(a) *The motions to suppress evidence obtained during interrogation, from the search of the van, and from the defendant's clothing.* As the judge found in her memorandum of decision, the defendant was interrogated by the police on September 22, 1987, the day after the murder and prior to the issuance of a warrant for his arrest. The defendant accompanied the police to the district attorney's office in Greenfield, where he gave a statement to the police and signed a form in which he consented to the search of his van and any locked or unlocked containers therein. Later that evening, prior to the issuance of a search warrant for the defendant's home, two police officers went to his home and obtained from the defendant the clothes he had been wearing on the evening of the murder.

The defendant now maintains that his consent to questioning, to the search of his van, and to delivering his clothes to the police was not voluntary. The defendant argues that the evidence from these three sources was obtained in violation of his rights under the Fourth and Fifth Amendments to the Constitution of the United States and art. 14 of the Declaration of Rights of the Massachusetts Constitution, and, therefore, should have been suppressed.

The record provides no basis for the defendant's assertion that his consent was not given voluntarily. He acknowledges that the police administered Miranda warnings to him, that he signed a form waiving his Miranda rights, that he signed a form consenting to the search of his van, and that he was advised that he could suspend the police interrogation or obtain counsel anytime he chose. Nonetheless, he argues that his statements and consents were not voluntary because he felt tired and distraught and did not really believe he was free to go, to remain silent, to refuse to consent to the search of the van, or to refuse to turn over his clothing. In essence, the defendant urges us to accept his version of the facts.[4]

The defendant presented these same claims to the judge, who categorically rejected them. She made findings of fact consistent with the testimony given by the police which indicated that the defendant's consent was voluntarily and intelligently given. We have repeatedly stated that "[t]he determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw and heard

---

[4]The defendant argues that a number of factors combined to render involuntary both his statement and the consent to the search and to turn over the clothing items. First, the defendant argues that he was very tired during the interrogation, and became distraught once the police informed him that the victim was dead. Second, the defendant argues that because the police took so long to prepare the consent form for the search of his van, he believed he was not free to leave until he signed it. Third, the defendant claims that the nature of the setting of the interrogation and the signing of the consent form, the district attorney's office, was inherently coercive. Finally, the defendant urges that he was both distraught over the victim's death and exhausted from the afternoon's interrogation when the police obtained the clothing from him.

the witnesses, and not of this court." *Commonwealth* v. *Harmon*, 410 Mass. 425, 431 (1991), quoting *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980). Moveover, in reviewing the denial of a motion to suppress, we will not disturb the findings of fact made by a judge absent a showing of clear error. *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990), and cases cited. The defendant has failed to show that the judge erred in any of her findings of fact, and we conclude that her conclusions of law on this aspect of the case are sound. The defendant's motions to suppress were properly denied.

(b) *Evidence seized from defense counsel.* The defendant argues that the videotape on which the defendant recorded his telephone conversation with the victim on the day of her death was improperly taken from his trial counsel and should have been suppressed because no exigent circumstances justified its warrantless seizure by the police. In addition, the defendant argues for the first time on appeal that, even if exigent circumstances justified the warrantless seizure, there was no justification for the police to view the videotape prior to obtaining a warrant. We reject both arguments.

As the judge describes in her memorandum of decision, the defendant's trial counsel entered the defendant's home while the police had the home under surveillance but before a search warrant had been issued. The police officer posted at the house for security purposes allowed the attorney to enter, but was then told by a supervisor not to allow the attorney to remove anything from the premises. When the attorney emerged with the videotape and a copy of a restraining order, the officer seized both items and would not allow the attorney to replace the items in the house.

The judge properly applied constitutional principles to the facts of the seizure. She found that the officer posted at the scene knew that the attorney represented the defendant and knew that at least one item the police planned to search for

in the house after obtaining a warrant was a videotape.[5] Exigent circumstances justified the seizure of the evidence. In view of what the officer at the scene knew, he had a reasonable basis to believe that material evidence might be in the process of being removed from the defendant's home. If material evidence had been removed, it could have been impossible to safeguard it from loss or destruction. This reasonable belief as to the potential loss or destruction of evidence created an exigent circumstance permitting the officer's warrantless seizure of the evidence. *Commonwealth* v. *Huffman*, 385 Mass. 122, 125 (1982). *Commonwealth* v. *Ortiz*, 376 Mass. 349, 356 (1978). *Commonwealth* v. *Forde*, 367 Mass. 798, 801 (1975). *Commonwealth* v. *Hall*, 366 Mass. 790, 802 (1975).

We reject the defendant's argument that the Commonwealth has not established that it was impracticable to obtain a warrant to seize the videotape and restraining order. The police did not have time to obtain a warrant because the defendant's attorney was preparing to take the items with him at the time of the seizure. Indeed, the police were in the process of obtaining a warrant at the time this exigency arose. Far from unreasonably hindering the warrant process, the police were actively in the process of doing all they could in order to secure a warrant. See *Commonwealth* v. *Cast*, 407 Mass. 891, 904 (1990).

We reject the defendant's further argument that the police created the exigency. The defendant hypothesizes that, instead of seizing the evidence, the police could have forbidden the attorney to enter the house, allowed him to return the items himself, or accompanied him into the house to return the items. None of these solutions would have been clearly adequate. First, at the time the attorney entered the house, he told the officer he only planned "to look around." At this time, there was no reason for the officer to believe that the

---

[5]At this point in the investigation, the police were still hoping to find the videotape depicting the defendant and the victim having sexual intercourse. See note 2, *supra*.

attorney intended to remove anything from the house and obviously no reason to deny him access. Second, allowing the attorney to replace the items on his own could have presented some risk of their loss. Finally, the police officer might not have wanted to enter the house with the attorney on the chance that he could see evidence in plain view. Had the officer observed and seized any evidence during such a warrantless entry, the defendant might have challenged that evidence on the ground of a warrantless search. The exigency did not result from any misconduct or unreasonable delay by the police. Cf. *Commonwealth* v. *Forde, supra* at 801-803 (police failed to get warrant after having probable cause for a week). The officer acted appropriately in seizing the evidence.

Lastly, the defendant argues that, even if exigent circumstances justified the warrantless seizure of the evidence, the police had no justification for viewing the videotape without obtaining a warrant. This argument was not raised below, so we consider it under the substantial likelihood of a miscarriage of justice standard. *Commonwealth* v. *Garcia,* 379 Mass. 422, 439 (1980). Because the police subsequently obtained a warrant which expressly authorized them to search the defendant's home and to seize any videotapes found there, the defendant cannot argue that, but for the warrantless viewing of the videotape, the police would never have acquired and viewed it. The police eventually seized thirteen videotapes from the home when they executed the search warrant. The viewing of the videotape earlier than might otherwise have been possible did not create a substantial likelihood of a miscarriage of justice.[6]

(c) *Motion for a* Franks *v.* Delaware *hearing.* Prior to trial, the defendant moved for a hearing pursuant to the

---

[6]The use of a false statement concerning the videotape in an affidavit filed in support of the search warrant also did not create a substantial likelihood of a miscarriage of justice. As will be discussed below, the statement concerning the videotape was not necessary to the finding of probable cause to issue the warrant. The judge properly admitted in evidence the videotape seized from the defendant's attorney.

principles discussed in *Franks* v. *Delaware*, 438 U.S. 154 (1978), on the premise that an affiant, State police Sergeant Norman Roberts, had intentionally or recklessly included a false statement of fact in his affidavit filed in support of the warrant application. This statement involved the videotape discussed above which Sergeant Roberts incorrectly stated had been partially erased. The judge found that Sergeant Roberts's misstatement was unintentional.

As pointed out by the judge in her memorandum of decision, the defendant failed to make a preliminary showing that the affiant's false statement was intentionally, knowingly, or recklessly made. Specifically, the judge relied on the fact that the officer who initially viewed the tape was looking for the videotape depicting the victim and the defendant having sexual intercourse, and he viewed the tape without its audio portion engaged. Under these conditions, the portion of the videotape that contained the recorded telephone call appeared to be blank, and Sergeant Roberts reasonably believed it to be blank. Because this portion of the videotape was imbedded in an otherwise full tape, Roberts reasonably surmised that the blank portion had been erased. Thus, the predicate for a hearing under *Franks* v. *Delaware* was not shown. See *Commonwealth* v. *Amral*, 407 Mass. 511, 522-523 (1990); *Commonwealth* v. *Ramos*, 402 Mass. 209, 215 (1988); *Commonwealth* v. *Singer*, 29 Mass. App. Ct. 708, 713-716 (1991).[7]

(d) *Motion to dismiss the indictment.* The defendant argues that the integrity of the grand jury was compromised by Sergeant Roberts's misstatement concerning the erasure of the videotape. We disagree. "In considering a claim that false or deceptive evidence was presented to a grand jury, we have said that a defendant must show that (1) the evidence was given to the grand jury knowingly or with reckless disre-

---

[7]The defendant's argument that the false statement is automatically rendered reckless because the police should not have viewed the videotape prior to the issuance of the warrant also fails. The defendant has established neither that the statement was recklessly made nor that it was necessary to the magistrate's finding of probable cause.

gard for the truth and for the purpose of obtaining an indictment, and (2) that the evidence probably influenced the grand jury's determination to indict the defendant." *Commonwealth* v. *Kelcourse*, 404 Mass. 466, 468 (1989). See *Commonwealth* v. *Mayfield*, 398 Mass. 615, 621 (1986). "Inaccurate testimony given in good faith does not by itself require dismissal." *Commonwealth* v. *Kelcourse, supra.* See *Commonwealth* v. *Reddington*, 395 Mass. 315, 319-320 (1985). Where, as is the case here, there is no showing that the false statement was intentionally or recklessly made, the judge properly denied the defendant's motion to dismiss the indictment.[8]

3. *Admission of evidence.* The Commonwealth presented evidence from several witnesses concerning the deterioration of the defendant's relationship with the victim before she was murdered. Prior to trial, the judge, in response to a motion in limine, issued a comprehensive ruling which reflected a careful assessment of the evidence the Commonwealth intended

---

[8]The defendant also attacks the indictment on jurisdictional grounds. The indictment read (in traditional form) as follows: "The Jurors for the said Commonwealth, on their oath, present that Gregory J. Martino of Greenfield in the County of Franklin, aforesaid, on or about the twenty-first day of September one thousand nine hundred and eighty-seven at Montague in the County aforesaid, did assault and beat Vivian A. Morrissey with intent to murder her, and by such assault and beating, did murder Vivian A. Morrissey." The defendant acknowledges that this indictment tracks the language of the statutory form set forth at G. L. c. 277, § 79 (1990 ed.).

Although the defendant raises this argument for the first time on appeal, the Commonwealth has fully briefed it, perhaps because the defendant has couched the argument in jurisdictional terms. The argument is without merit. As one noted commentator has observed: "An indictment which used the statutory form and charged the defendant with murder was not vague, indefinite or in violation of Article 12 of the Declaration of Rights, and in any event if the allegations were not sufficient to enable the defendant to prepare his defense, he was not entitled to have the indictment dismissed but was entitled as a matter of right to such particulars as might be necessary in order to give him reasonable knowledge of the nature and grounds of the crime charged." K.B. Smith, Criminal Procedure § 730 (1983), citing *Commonwealth* v. *Baker*, 368 Mass. 58 (1975). There is nothing to indicate that the defendant ever requested a bill of particulars. No reason exists to question the adequacy of the indictment.

to introduce on this issue. The judge permitted the Commonwealth to introduce evidence that (1) the defendant had accused the victim of "sleeping around"; (2) the victim had told a number of her friends and family that she no longer wanted to be involved with the defendant; (3) the victim had been injured in a physical altercation with the defendant; (4) the victim had her locks changed because the defendant would not return her key and she was afraid of him; (5) the victim had her telephone number changed to an unlisted number; and (6) the victim obtained a restraining order against the defendant approximately one week before she was murdered. The judge excluded statements made by the victim that the defendant had beat her, had tried to rape her, and had threatened revenge. On appeal, the defendant does not argue that the evidence at issue was not properly admitted. Rather, he contends that he was prejudiced by the cumulative nature of the evidence. In addition, he argues that much of the evidence consisted of prior bad acts, and, therefore, the prejudicial effect of the evidence was unnecessarily exacerbated.

"In Massachusetts, evidence of other criminal behavior may not be admitted to prove the propensity of the accused to commit the indicted offense but it is admissible for other relevant probative purposes." *Commonwealth* v. *Gallison,* 383 Mass. 659, 672 (1981), citing *Commonwealth* v. *Chalifoux,* 362 Mass. 811, 815-816 (1973). Furthermore, "[t]he admission of such evidence generally is 'a matter on which the opinion of the trial judge will be accepted on review except for palpable error.' *Commonwealth* v. *Young,* 382 Mass. 448, 462-463 (1981)." *Commonwealth* v. *Cordle,* 404 Mass. 733, 744 (1989), *S.C., ante* 267 (1992).

The judge engaged in a scrupulous analysis of all the evidence proposed by the Commonwealth. Her rulings minimized the prejudicial impact of the evidence of the defendant's hostile relationship with the victim. Furthermore, the evidence concerning the relationship between the defendant and the victim, including the restraining order she had obtained and her decision to change the locks on her house, was

introduced by separate witnesses each of whom had a different relationship with the victim. It was significant to the Commonwealth's case that the victim shared her fear and anxiety toward the defendant with a number of people. The evidence was not only relevant to show "the 'entire relationship' between the victim and the defendant," *Commonwealth v. Cordle, supra* at 744, quoting *Commonwealth v. Drew,* 397 Mass. 65, 79 (1986), but it also tended to show the depth of the victim's fear of the defendant.[9]

4. *Denial of the motion for a mistrial.* During the prosecutor's direct examination of the man the victim had begun to date two weeks before she was murdered, the witness unexpectedly stated that the victim had told him that "Greg Martino threatened to kill me . . . ." The witness was interrupted by the judge who immediately interjected, "Stop. Side Bar." The defendant objected to the testimony, and eventually moved for a mistrial. The motion was denied. The judge then ordered the testimony struck and instructed the jury as noted below.[10] The defendant argues that he was greatly harmed

---

[9] We reject the defendant's argument that the restraining order obtained by the victim should not have been introduced in evidence as an exhibit. The restraining order, however, had been referred to on a number of occasions by several witnesses in their testimony. As has been discussed above, this testimony was properly admitted. Thus, the introduction of the order itself could not have harmed the defendant.

We also reject the defendant's claims that the judge's limiting instructions to the jury with respect to their consideration of the evidence were deficient. The judge accurately and thoroughly instructed the jury on the purpose for which they could consider the evidence. Moreover, an appropriate limiting instruction was given each time particular portions of the evidence were introduced without objection by the defendant's trial counsel.

[10] "Ladies and gentlemen, with respect to the last statement made by the witness, you are to totally disregard that statement, you are to strike that statement out of your minds. You have taken an oath as jurors to follow my instructions regarding the law, I have made very definitive rulings regarding the law in this case, and I am telling you must abide by it and you must abide by what I am telling you, and that is to strike from your minds and strike from any consideration whatsoever any statement — the last statement that was just made by the witness. It was not competent testimony, it was not acceptable testimony, and it is not testimony that will be considered within this trial."

by the witness's spontaneous remark and, as a consequence, it was error for the judge to have denied his motion for a mistrial. We reject the argument.

The decision whether to declare a mistrial lies within the trial judge's discretion. *Commonwealth* v. *Amirault*, 404 Mass. 221, 232 (1989), and cases cited. In this case, before the witness made his unanticipated remark, the jury knew that the relationship between the victim and the defendant had deteriorated considerably. In view of the evidence of the failed relationship, it is difficult to imagine that the jury could have been unduly influenced by the witness's spontaneous remark. See *Commonwealth* v. *Gil*, 393 Mass. 204, 218-219 (1984). In the circumstances, the judge's use of a curative instruction was an adequate response to the problem. See *Commonwealth* v. *Gallagher*, 408 Mass. 510, 518 (1990); *Commonwealth* v. *Amirault, supra* at 239-240.

5. *The prosecutor's closing argument.* In her closing argument to the jury, the prosecutor commented in the manner noted below[11] on the explanation the defendant gave at trial concerning the note found on the victim's kitchen table. The defendant's trial counsel objected to this portion of the prosecutor's argument at the conclusion of her summation. The judge responded by offering to emphasize in the final jury instructions that the defendant never has to offer proof and "he certainly never has to explain anything." The judge followed through on this promise and later instructed the jury: "The presumption of innocence also means that no person ever has to prove his or her innocence. No person charged with a crime ever has to explain anything to a jury. Exactly

---

[11]"And I suggest to you that he's had a year plus since the time that he talked to the police to work out some explanation of why he would leave a note containing mistruths, why he would leave a note that refers to making love when there is no way of being able to show that that's what happened and that didn't happen and that was something that was completely out of the relationship at the time that he wrote that note.

"And if you compare it to what he says in his statement, you will see that what he was talking about in his statement was that very note and it's now a year later when he has contrived a story to try to explain away all of the evidence that was left behind."

the contrary is true." Despite this, the defendant argues that the prosecutor's comment violated the principle of *Commonwealth* v. *Person*, 400 Mass. 136 (1987). We do not agree.

Here, unlike *Person*, where the prosecutor improperly commented on the defendant's silence, there was evidence that the defendant's trial testimony differed from his pretrial position as to the note. As the prosecutor indicated, the defendant was asked when he was first interviewed by the police about the note that had been left on the kitchen table. At that time, the defendant stated that the note left on the table had been written the afternoon before the victim was murdered. At trial, however, the defendant claimed that he was referring to a different note when he was speaking to the police. He also testified that he had no idea what happened to this other note. The prosecutor was entitled to comment on the difference between the defendant's pretrial statements and his trial testimony. *Commonwealth* v. *Sherick*, 401 Mass. 302, 304-305 (1987).

The defendant also criticizes the prosecutor's argument that consciousness of guilt could be inferred from the defendant's failure to tell the police that he had recorded a telephone conversation between himself and the victim on a videotape. There was no objection to this portion of the prosecutor's argument at trial. Accordingly, the standard of review is whether the argument created a substantial likelihood of a miscarriage of justice.

The defendant's claim that the prosecutor's remarks impermissibly infringed on his right to remain silent fails for the simple reason that the defendant did not exercise his right to remain silent. See *Commonwealth* v. *Hartman*, 404 Mass. 306, 317-318 (1989). Compare *Commonwealth* v. *Cobb*, 374 Mass. 514, 520-522 (1978). As shown by the judge's findings of fact on the defendant's pretrial motions, the defendant made a lengthy statement to the police in which he discussed his relationship with the victim in some detail. The full statement was introduced in evidence after the judge ruled that it had been made voluntarily. In view of the detail of the statement, the defendant's omissions could

be found to be significant, and the prosecutor was entitled to comment on them.[12] *Commonwealth* v. *Sherick, supra* at 305 (collecting cases where similar comments made by prosecutors have been considered to be permissible comments on the evidence).

6. *Replacement of a deliberating juror.* The defendant next challenges the judge's discharge of a deliberating juror in his absence as a violation of his right to a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, art. 12 of the Declaration of Rights to the Massachusetts Constitution, and G. L. c. 234, § 26B (1990 ed.).[13] Specifically, the defendant argues that, although his trial counsel was present when the judge made inquiries of the juror and agreed to the juror's discharge, he had a fundamental right to be present. In addition, the defendant claims that the record does not demonstrate that he made a voluntary, knowing and intelligent waiver of his right to be present, and, therefore, that the alleged error cannot be considered harmless.

The problem arose at the conclusion of a day of deliberations, when the foreperson of the jury advised the judge that there was a "serious problem" with one of the jurors who wanted to speak with the judge. Efforts to resolve the problem without the judge's speaking directly with the juror were

---

[12]The defendant's initial failure to tell the police that he had recorded the telephone conversations could also be considered indicative of consciousness of guilt. See *Commonwealth* v. *Lavalley*, 410 Mass. 641, 649 (1991).

[13]This statute provides, in pertinent part, for the use of an alternate juror to replace a deliberating juror as follows:

"If, at any time after the final submission of the case by the court to the jury and before the jury has agreed on a verdict, a juror dies, or becomes ill, or is unable to perform his duty for any other good cause shown to the court, the court may order him to be discharged and direct the clerk to place the names of all of the remaining alternate jurors in a box and draw the name of an alternate, who shall then take the place of the discharged juror on the jury, which shall then renew its deliberations with the alternate juror. The court shall have jurisdiction to receive the verdict of the jury constituted under the provisions of this section and shall have jurisdiction to render judgment in said case."

not satisfactory. Thereafter, the foreperson advised the judge (by way of a note) that "the problem arises out of a declaration that perhaps should have been made by the juror before she was selected. It might have resulted in her being challenged. [The juror] will meet with you in your chambers."

The defendant's trial counsel and the prosecutor discussed the situation with the judge at considerable length. It was finally decided that the judge would ask the juror if anything had occurred that might affect her impartiality. When that question was posed to the juror, she responded in the negative. This inquiry took place in the lobby with the defendant's trial counsel and the prosecutor present. There was no objection to the procedure, and counsel did not request that the defendant be present. The judge, trial counsel for the defendant, and the prosecutor then discussed various alternatives. What was apparent to everyone, however, was that the "problem" affecting the juror, if indeed one existed, had not been disclosed. The judge then excused counsel to allow them some time to consider the situation again.

When the lobby conference recommenced, it was agreed that the judge would make further inquiry of the juror. The juror was then called back into the lobby. The judge, the defendant's trial counsel, and the prosecutor were present. Once again, the defense counsel made no objection to the procedure. This time when the judge asked the juror whether there was any matter that should have been brought to the court's attention during empaneling of the jury, the juror responded affirmatively. The juror then revealed that her grandfather had been convicted of murder and had been imprisoned for ten years. The juror also indicated that, had she realized that the juror questionnaire form required the disclosure of this information, she would have disclosed it. The inquiry then ended and another recess was taken in order for counsel to determine what course of action to take.

Approximately ten minutes later, the defendant's trial counsel and the prosecutor reported to the judge that they had agreed that the juror should be discharged. The defendant's trial counsel also stated: "For the record, I explained

the problem to [the defendant] and he agrees." When the judge asked whether the defendant's trial counsel would prefer an acknowledgement of the defendant's agreement on the record, either in court or in the lobby with the presence of the court stenographer, counsel replied: "I'm satisfied that [the defendant is] satisfied [with] the volatility of leaving a person on there like that, and not knowing the problems that could result in any way, and he agrees that this is the best solution."

Thereafter, the juror was excused. An individual voir dire was conducted by the judge of each of the remaining eleven jurors. Each juror was asked whether anything had occurred at any time during the case "up to and including this moment which would in anyway effect, or does effect, your ability to be fair and impartial and judge the case based solely on the evidence?" All eleven jurors responded in the negative. An alternate was then selected, and the jury were instructed that they were required to begin their deliberations anew.

When a judge conducts an inquiry about a consequential matter, such as occurred in this case with the troubled juror, there is a requirement, deriving from the constitutional rights of confrontation and fair trial, that the defendant and his counsel be present. See *Commonwealth* v. *Connor*, 392 Mass. 838, 843 n.1 (1984); *Commonwealth* v. *Robichaud*, 358 Mass. 300, 301-303 (1970); *Commonwealth* v. *Perez*, 30 Mass. App. Ct. 934, 935-936 (1991); *Commonwealth* v. *Bobilin*, 25 Mass. App. Ct. 410, 415 (1988); *Commonwealth* v. *Hicks*, 22 Mass. App. Ct. 139, 147 (1986). The absence of the defendant from such a colloquy, however, does not automatically constitute reversible error. See *Commonwealth* v. *Hicks*, *supra*. We conclude that no basis for reversal has been demonstrated here.

All discussions by the judge with counsel and with the juror were made a matter of record. That record unequivocally shows that the defendant was fully informed of everything that occurred. No objection was made to the procedure followed by the judge. The procedure was carefully tailored to

protect the juror's privacy and the integrity of the jury as a whole, and to give the defendant, through his counsel, sufficient opportunity to evaluate the problem and to arrive at a solution that the defendant, at the time, thought was in his best interests. Importantly, the defendant's trial counsel indicated that the defendant *agreed* to the discharge of the juror. Further, counsel declined the opportunity to have the defendant's acquiescence placed affirmatively on the record. Nothing has been provided to show that, at the time the juror was discharged, the defendant disagreed with the resolution arrived at after considerable inquiry and discussion.

In the absence of any objection,[14] and in view of the affirmative representations of defendant's trial counsel of the defendant's understanding and agreement ("good cause" existing under G. L. c. 234, § 26B, to replace the juror), the defendant is not entitled to another trial because of the incident.

7. *Allegations of ineffective assistance of counsel.* The defendant argues that his trial counsel provided him with ineffective assistance of counsel by: (1) failing to object to the defendant's absence during the examination of the juror who was discharged; (2) failing to accept the trial judge's offer of jury instructions on manslaughter based on intoxication; (3) failing to request a "mere presence" instruction; and (4) failing to recognize that a defense witness would testify in a

---

[14]Compare *Commonwealth* v. *Connor*, 392 Mass. 838, 842-847 (1984) (reversal required where the record failed to establish that discharge of juror was for good cause shown and defendant objected to the discharge); *Commonwealth* v. *Robichaud*, 358 Mass. 300, 303 (1970) (reversal required where defendant was excluded from voir dire of juror over his objection); *Commonwealth* v. *Perez*, 30 Mass. App. Ct. 934, 935-936 (1991) (defendant's conviction reversed where sick juror was discharged in the absence of the defendant and his attorney over the defendant's objection); with *Commonwealth* v. *MacDonald (No. 1)*, 368 Mass. 395, 400 (1975) (court found that because the defendant failed to object to his absence from private interviews with the jurors, he was precluded from raising the issue on appeal); *Commonwealth* v. *Hicks*, 22 Mass. App. Ct. 139, 146-147 (1986) (although the judge's interrogation of jurors outside the presence of the defendant constituted error, the error was harmless where defendant failed to object).

manner favorable to the Commonwealth on cross-examination. Because this is a first degree murder case, "we need not focus on the adequacy of trial counsel's performance" to decide the claims. Rather, "we shall consider [under the standard set by G. L. c. 278, § 33E] whether there was an error . . . and, if there was, whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

(a) The defendant's absence when the judge conducted an inquiry into the possible discharge of a deliberating juror provides no basis for relief. As has been discussed, the record clearly demonstrates that the defendant's trial counsel conferred with him during the interrogation of the juror and obtained his agreement to her discharge. The defendant has not shown that he was excluded from participating in his defense.

(b) Trial counsel's refusal of the judge's offer to give a manslaughter instruction based on evidence of the defendant's consumption of alcohol was proper. The record indicates that the defendant participated fully in the decision to refuse the instruction. That decision was reasonable in view of the slight evidence of alcohol consumption and the fact that the defense proceeded on the theory that someone else committed the murder, a theory that would have been undermined had the instruction been given.[15]

(c) The absence of a request for an instruction that evidence of the defendant's presence at the crime scene alone was insufficient to warrant a conviction was not significant. Because the Commonwealth presented evidence which established far more than the defendant's mere presence at the

---

[15]A request for a voluntary manslaughter instruction on the basis of heat of passion was properly denied by the judge. There was no evidence to suggest a killing "for a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat." *Commonwealth* v. *Soaris*, 275 Mass. 291, 299 (1931). Trial counsel's request for this instruction and his refusal to accept the intoxication instruction were not inconsistent with the defense or disadvantageous to the defendant.

scene, there is no likelihood that the jury could have convicted him on this evidence alone. This case is not like *Commonwealth* v. *Cordle*, 404 Mass. 733, 742-743 (1989), *S.C.*, *ante* 172 (1992), in any material aspect.

(d) The decision to call a defense witness who gave testimony damaging to the defense was proper. This witness testified on direct examination that she had a telephone conversation with the victim for approximately two hours on the evening of the murder. As the defendant concedes in his brief, this testimony was important to him because the witness's testimony, if accepted, tended to establish that the victim was still alive after the defendant had left her home. The fact that the witness gave harmful testimony when she was cross-examined was a risk implicit in her being called to testify. The witness's testimony provided a key link in the defendant's over-all defense strategy notwithstanding her failures when pursued on cross-examination. A new trial is not warranted simply because this strategy was not so successful as originally planned.

8. *Review under G. L. c. 278, § 33E.* The defendant also asks that we exercise our power under G. L. c. 278, § 33E, to order a new trial, or, in the alternative, to reduce the verdict to manslaughter. The defendant is not entitled to the relief he seeks.

In support of his request for a new trial, the defendant argues that his expert witnesses were better qualified than the experts presented by the Commonwealth and that the testimony of a defense witness whose testimony on cross-examination favored the Commonwealth was not credible. For these reasons, the defendant argues, the verdict was against the weight of the evidence, and he is entitled to a new trial. However, the defendant's arguments concern matters that are generally within the sole province of the jury. As we have stated in previous cases, this court does not sit as a second jury in reviewing cases under G. L. c. 278, § 33E. *Commonwealth* v. *Luce*, 399 Mass. 479, 485 (1987). *Commonwealth* v. *Smith*, 357 Mass. 168, 181 (1970). See *Commonwealth* v. *Schnopps*, 390 Mass. 722 (1984). The evidence tying the de-

fendant to the murder was more than sufficient to establish his guilt beyond a reasonable doubt.

The defendant argues that his alleged consumption of one-half of a marihuana cigarette and two or three cans of beer on the day of the murder rendered him incapable of forming the mental state necessary to prove murder in the first degree. The defendant also argues that the killing may well have taken place during the course of an emotional argument between himself and the victim. These two factors combined, the defendant urges, justify reducing the verdict to manslaughter. We disagree.

While the defendant testified to having consumed the marihuana and beer, there is nothing to show that the consumption impaired him in any way. Moreover, there is no indication that the victim was killed in the heat of passion. Rather, the record indicates that the victim was strangled from behind, resisted the attack, and took from three to seven minutes to die an agonizing death. In these circumstances, there is no justification for a reduction in the jury's verdict.

*Judgment affirmed.*