## COMMONWEALTH *vs.* EDWARD T. MARTIN.

No. 93-P-1309.

Berkshire. October 21, 1994. - January 24, 1996.

Present: DREBEN, SMITH, & PORADA, JJ.

Further appellate review granted, 422 Mass. 1105 (1996).

*Acquired Immunodeficiency Syndrome. Evidence*, Relevancy and materiality, Credibility of witness. *Practice, Criminal*, Comment by prosecutor, Instructions to jury, Security measures, Fair trial. *Judge.*

At the trial of rape indictments, evidence that the defendant had told the complainant, prior to the alleged assaults, that the defendant had tested HIV positive and had AIDS was admissible, with proper instructions to the jury on their use of such evidence, as relevant to the issue whether the complainant had consented to sexual intercourse [662-664]; the judge erred in failing to give the jury appropriate instructions [664].

There was no basis in the record of a rape trial to warrant the placing of leg irons on the defendant and physically separating the defendant from his counsel; the judge's imposition of excessive security measures was error. [664-665, 667-669]

At the trial of rape indictments, in which the complainant's testimony that the defendant had told her, prior to the alleged assaults, that he had AIDS was the only evidence introduced regarding the possibility that the defendant might have AIDS, the judge's comments regarding the safety of the clothing exhibits and the providing of gloves to jurors who wished to examine certain evidence were an improper vouching for the credibility of the complainant. [669-670]

At the trial of a criminal case, the judge erred in giving the jury a copy of his written charge where the parties had not agreed on the record to such a procedure and where the written instructions did not include all of the judge's oral instructions. [670-671]

The cumulative effect of several errors at a criminal trial deprived the defendant of a fair trial: a new trial was required. [671]

INDICTMENTS found and returned in the Superior Court Department on May 22, 1991.

The cases were tried before *Charles R. Alberti*, J.

*Jack D. Curtiss* for the defendant.

*Eric Neyman*, Assistant District Attorney, for the Commonwealth.

SMITH, J. The defendant was the subject of five indictments, two charging him with rape, one with aggravated rape, one with assault and battery, and one with burglary and assault on an occupant in a dwelling. A Superior Court jury returned guilty verdicts on four of the indictments and a not guilty verdict on one of the rape indictments. On appeal, the defendant raises several issues. Three of these issues are related. They include claims that the judge committed error in (1) allowing in evidence the complainant's testimony that the defendant allegedly told her he had tested HIV positive and had AIDS, (2) taking certain security precautions in the allegedly mistaken belief that the defendant planned to use his "infected blood" to cause a mistrial, and (3) informing the jury that if they wanted to examine certain exhibits, the judge would provide gloves. Among other issues, the defendant also claims that the judge committed error by giving a written copy of his jury instructions to the jury.

We summarize the evidence presented by the Commonwealth. We will relate other evidence when we discuss specific issues. On May 16, 1991, the complainant and a friend went to a lounge in Pittsfield to celebrate the friend's birthday. The complainant met her brother there. At approximately 1:30 A.M. (now May 17), the complainant and her brother left the lounge. They walked together for a time, then separated, and the complainant walked alone to her apartment building. Entry to the apartment building was through locked main doors in the front of the building. The complainant lived in the first apartment to the left after entry through the main door.

After using her key to enter through the main door and as she was preparing to open her apartment door, she heard someone call her first name. She looked up and saw the defendant coming toward her. The complainant and the defendant had known each other for some time and had dated in the past. However, that relationship had terminated prior to May 17, and the complainant had not seen the defendant for approximately eight or nine months. The complainant knew the defendant had been in jail and thought he was be-

ing released on May 27. Because she was afraid of the defendant, she had purchased a train ticket to Las Vegas to visit relatives so that she would not be in Pittsfield when he was released from jail.

The defendant placed his arms around the complainant so she could not move. He pushed the apartment door open and pushed the complainant into the apartment. Once inside the apartment, the defendant accused the complainant of cheating on him, called her names, and hit her. After the second punch, she fell onto the couch. The defendant removed her clothes and raped her. The defendant then dragged the complainant into the bedroom where he again raped her. He then performed oral sex on her. The defendant then raped the complainant again.

After the last incident, the defendant left the bedroom and went to the kitchen. The door buzzer began ringing, but the defendant would not allow the complainant to answer. The complainant was afraid to move because she thought the defendant would grab and punch or kill her.

At approximately 7:00 A.M., the door buzzer rang again. The complainant told the defendant that she believed her children were at the door. The defendant allowed her to open the door. A male friend of the complainant was there. She wrapped a blanket around her waist, showed her injuries to the friend, and whispered, "Eddie got out and he's in there." The complainant then pushed open the door and ran with her friend to another friend's house, where she called the police. When the police arrived, the complainant told them she had been sexually assaulted and beaten. Several officers went to the complainant's apartment, where they found the defendant asleep in the bedroom and arrested him.

The police brought the complainant to the hospital. She was treated for extensive facial bruising and swelling about her head and neck, which, according to a doctor, had resulted from a severe beating. Using a rape kit, a doctor and nurse conducted a full examination of the complainant. The rape kit was later introduced in evidence. A chemist testified that he had tested and analyzed various items from the rape

kit and several items of clothing taken from the apartment. The expert's opinion was that the semen found on the genital swabbing, clothes, bedspread, and bedsheet was consistent with having originated from the defendant.

The theory of the defense as to the indictments alleging sexual assault was that the complainant consented to the various acts of intercourse.[1] Two defense witnesses testified that the complainant's reputation in the community for truth and veracity was bad. One of the witnesses testified that she lived next door to the complainant and they shared a common wall. She testified that during the early morning hours of the day in question she heard nothing out of the ordinary. The other witness testified that, in the latter part of April or the beginning of May, 1991, the complainant had told him that she loved the defendant and that when he returned to the Pittsfield area, he would be staying with her.

In an attempt to explain the bruises on the complainant, the defense produced a witness who testified that, on May 16 at about 11:00 P.M., she had seen the complainant with a man, who was not the defendant. The complainant appeared to be having a problem with the man, and she seemed to be agitated.

The defendant did not testify.

1. *The AIDS issues.* Two of the issues are related, directly or indirectly, to the admission in evidence of testimony that the defendant told the complainant he had tested HIV positive and had AIDS. We have placed these issues under one heading ("The AIDS issues") but will discuss each issue separately. We rule at the end of our analysis of each issue that the judge committed error. However, we do not examine the particular error to determine whether, by itself, that error requires a new trial. We reserve our decision on that matter until after we have decided all of the AIDS issues.

---

[1]The "consent" defense was raised by defense counsel in her opening statement and was also featured in her closing argument. Defense counsel stressed that the parties had had a previous relationship; that the complainant allegedly had made statements regarding her love for the defendant; and that there was no medical evidence of any vaginal or genital trauma to the complainant.

a. *The introduction of the defendant's statement that he had AIDS*. During the direct examination of the complainant, the prosecutor requested a sidebar conference. During that conference, the prosecutor stated that he wanted to question the complainant as to the reason why she decided, prior to his release from jail, not to have any further "relationship" with the defendant. The prosecutor told the judge and defense counsel that the complainant would respond that the defendant had told her, sometime before May 17, that he had tested positive for HIV and that he had AIDS. The prosecution argued that the statement was admissible because one of the main issues in the case was whether the complainant had consented to the various acts of intercourse and that obviously she would not have engaged in sexual intercourse with the defendant if she knew he had AIDS.

Defense counsel objected to the admission in evidence of the defendant's statement on the ground that it was so prejudicial that its prejudicial impact outweighed its relevance on the issue of consent. The judge ruled that the statement was admissible because it was relevant on the issue of consent and, therefore, allowed the prosecutor to so inquire of the complainant.

The complainant then testified that, during a telephone conversation sometime before May 17, the defendant told her that he had tested positive for HIV and that he had AIDS. She testified that she knew of the defendant's condition while he was sexually assaulting her and that, as a consequence, she would never have consented to have sexual relations with him. Later, in response to the prosecutor's question, she testified that, during one of the rapes, he "ejaculated," and the complainant thought "that I was going to die of AIDS." That testimony was the subject of an objection which was overruled.

On appeal, the defendant claims that the introduction in evidence of his alleged statement that he had AIDS was so inflammatory and prejudicial as to constitute reversible

error.[2] "Whether evidence is relevant in any particular instance and whether the evidence is so inflammatory in nature as to outweigh its probative value and thus preclude its admission are questions addressed to the sound discretion of the trial judge." *Commonwealth* v. *Booker*, 386 Mass. 466, 469 (1982). Accord *Commonwealth* v. *Dunn*, 407 Mass. 798, 807 (1990); *Commonwealth* v. *Helfant*, 398 Mass. 214, 225 (1986) (Evidence "must be relevant to the offense charged; where the relevance is not substantial but borderline, the evidence must be excluded unless its probative value on the issue in contention outweighs the undue prejudice that may flow from it"). "Moreover, that decision 'will be accepted on review except for palpable error.' " *Commonwealth* v. *Harvey*, 397 Mass. 351, 359 (1986), quoting from *Commonwealth* v. *Young*, 382 Mass. 448, 462-463 (1981).

Here, the evidence was clearly relevant because it went to a critical issue in the case — whether the complainant consented to the various acts of sexual intercourse. *Commonwealth* v. *Chretien*, 383 Mass. 123, 135 (1981) (Commonwealth may present evidence that rape victim was also the plaintiff in a divorce action against the defendant and, therefore, unlikely to have consented to subsequent sexual intercourse).

Because the evidence indicates that the defendant had AIDS, it is highly prejudicial. The "devastating effects of [AIDS] and widespread lack of knowledge about it have produced deep anxieties, and considerable hysteria, about the disease and those that suffer from it." *Raytheon Co.* v. *Fair Employment & Hous. Commn.*, 212 Cal. App. 3d 1242, 1252 (1989). See also *Johnetta* v. *Municipal Court*, 218 Cal.

---

[2] "AIDS is actually the end-stage of infection with the human immunodeficiency virus [HIV]. HIV is a slow acting virus . . . . Spread through sexual intercourse, HIV-contaminated needles, transfusions of contaminated blood and blood products and from mother to infant during pregnancy or birth, HIV enters the body, seeks out and destroys key cells that regulate the immune system. After causing irreparable damage to the body's ability to ward off serious infections and malignancies, people with AIDS eventually succumb to a range of AIDS-related infections and cancers." National Judicial College, American Bar Association, AIDS Benchbook (1994).

App. 3d 1255, 1283 (1990). The fact that the evidence was highly prejudicial, by itself, does not mean that the evidence must be excluded. Rather, we hold that because the relevance of the evidence was substantial, it was admissible, provided proper cautionary instructions were given to the jury to minimize or possibly to dissipate the prejudice or fear likely to arise from the testimony. Compare *Commonwealth* v. *Dunn*, 407 Mass. at 807 & n.2 (chance of prejudice was minimized by limiting instruction); *Commonwealth* v. *Roderick*, 411 Mass. 817, 819 (1992) (cautionary instructions generally are adequate safeguard against the risk of undue prejudice). Here, such instructions should have included the following: the jury determines the credibility of the witnesses; if the jury believes that the defendant made the statement to the complainant, they shall consider the statement only on the issue of the complainant's state of mind at the time of the alleged assaults and rapes, but they are not to allow themselves to become prejudiced against the defendant because they believe he has AIDS.

Defense counsel did not request such instructions. However, in view of the circumstances of this case, the judge, on his own, should have given cautionary instructions to the jury.[3] Therefore, we rule that the evidence was admissible provided that proper instructions were given. Because the instructions were not given, the prejudicial effect of the reference to the defendant having AIDS was not minimized or dissipated. We conclude that, in the absence of such instructions, it was error for the judge to admit the evidence.

b. *The ordering of security measures.* The defendant claims that the judge abused his discretion when he ordered that certain security measures be taken in order to restrain the defendant. The judge ordered these security measures to prevent the defendant from any misbehavior that would re-

---

[3]The judge obviously recognized the prejudicial effect of the evidence. In ordering security measures, see section 1.b. of this opinion, the judge said to the lawyers, outside of the presence of the jury, "This is not an ordinary prisoner. This is a prisoner with AIDS, about which people are absolutely beside themselves."

sult in a mistrial. The defendant argues (1) that the security measures were not justified, (2) that they were excessive, and (3) that the procedural requirements of *Commonwealth* v. *Brown*, 364 Mass. 471, 478-480 (1973), were violated.

The events leading to the imposition of the security restraints are contained in the written report of a court officer which was given to the judge. We summarize that report.

At the lunch recess, during the second day of trial, the defendant was taken from the courtroom and led back to the holding cell. He "went into a rage" and stated that "his trial isn't going so well" and that "he wasn't going to spend the rest of his life in prison for something he didn't do, and that he wasn't leaving the court alive." Shortly thereafter, the court officer noticed blood on the defendant's hand. The court officer asked the defendant what had happened. The defendant replied, "It is just a cut and I'll be all right."

The court officer then stated in his report, "Knowing that Mr. Martin has a medical problem (AIDS) I then notify [*sic*] Judge Alberti in his chambers about what was going on with Mr. Martin . . . ." The court officer also notified the house of correction about the matter so that Martin could seek medical attention because he "needed it." The court officer concluded his report as follows: "In my opinion as chief court officer I feel Mr. Martin was planning an escape, and using his own blood as [a] weapon."

After the judge received the court officer's report, he talked to counsel and, with their agreement, adjourned the trial for the rest of the day.

The following morning, the judge conferred with both counsel in his lobby. He stated that from the defendant's behavior and from the court officer's report, he believed that the defendant had cut himself intentionally and that there might be "violence" directed at defense counsel. The judge further stated that "the inference that I draw is that the blood is a weapon. He is someone who is infected with AIDS.[4] These court officers are very concerned, and you (de-

---

[4]There is nothing in the record that shows that the defendant actually had AIDS or had tested HIV positive. We do not know if the judge was

fense counsel) should be very nervous. The inference is that he's seeking to create a mistrial, things aren't going well here, and therefore he's got nothing to lose . . . ."

The judge then stated that leg irons would be placed on the defendant with covers over the leg irons so that the jury could not see them. He stated that another table would be placed alongside defense counsel's table with law books placed between the defendant and defense counsel in order to give her "some distance in the event that he acts up."[5] The judge also ordered that security personnel be placed behind and beside the defendant.

The judge then ordered defense counsel to inform the defendant about the security restraints and to tell him that the defendant had "no options." The judge also told defense counsel that if the defendant did "act up" he would be removed from the courtroom and be placed in a separate room with a microphone.

Defense counsel objected to the planned restraints. She told the judge that she had talked to the defendant after the previous day's incident, that the defendant was prepared to sit at counsel table with her as he had done quietly throughout the trial, and that over the five months she had represented him, she had been in closed rooms with him and he had never been violent toward her. The judge overruled her objections and implemented the security measures.

---

presuming that the defendant had AIDS from the complainant's testimony, see section 1.a. of this opinion, or had knowledge from some source that is not disclosed on the record.

We asked counsel at argument whether they knew of any lobby conferences that had not been recorded, or whether we were missing part of the record. Appellate counsel assured us that the record was complete and that they were not aware of any unrecorded lobby conferences. However, appellate counsel were not the trial counsel.

[5]The defendant had been sitting beside defense counsel at counsel table. When defense counsel objected to the judge's order that she "physically distance" herself from the defendant, the judge stated, "Suppose he takes you as a hostage or grabs you. I mean he can do that. He can stand up and grab you and threaten you, and if he's got an open wound, Ms. Myers, I don't want you in that position."

"Shackling and other unusual security measures are . . . to be avoided if possible." *Commonwealth* v. *Brown*, 364 Mass. at 475. "These displays tend to create prejudice in the minds of the jury by suggesting that the defendant is a bad and dangerous person whose guilt may be virtually assumed; they may interfere with a defendant's thought processes and ease of communication with counsel; intrinsically they give affront to the dignity of the trial process." *Ibid.* However, there is no question that "the judge has a duty to do what may be necessary to prevent escape, to minimize danger of harm to those attending trial as well as to the general public, and to maintain decent order in the court room." *Ibid.* But "[a] judge who contemplates approving [shackling or other unusual security] measures should state his reasons (including recommendations received from custodial authority) in the presence of counsel and [the] defendant, and out of the presence of venire [persons] or jury, and provide an opportunity for counsel to make their objections known." *Commonwealth* v. *DeVasto*, 7 Mass. App. Ct. 363, 365-366 (1979), quoting from *Commonwealth* v. *Brown*, 364 Mass. at 479. See also Mass.R.Crim.P. 45, 378 Mass. 921 (1979) (providing in relevant part, "If the trial judge orders [shackling], he shall enter into the record of the case the reasons therefor"). "The burden is on a defendant to show that the judge's decision in the matter was wrong, and an appellate court, acknowledging that the judge has a range of discretion, will not reverse his decision and vacate a conviction unless he is shown to have been arbitrary or unreasonable." *Commonwealth* v. *Brown*, 364 Mass. at 476.

The court officer reported to the judge that, in his opinion, the defendant was planning to escape and to use his blood as a weapon. There is no question that a judge "may attach significance to the report and recommendation of an official charged with custody of prisoners placed on trial . . . ." *Id.* at 475. Here, the judge apparently rejected the court officer's opinion that the defendant planned to escape. Rather, the judge inferred that the defendant was going to use his blood

as a "weapon," somehow "grab" defense counsel, and thereby cause a mistrial.

There is nothing in the record that shows that the defendant had been disruptive in the courtroom before the incident in the holding cell. There is nothing in the record that demonstrates that the defendant had been violent to jail or court personnel leading up to his trial and during it. There is nothing in the record that demonstrates that the defendant had been violent toward defense counsel in the five months she had represented him.

There was no evidence that he intended to use his blood as a weapon. The incident of the cut, whether self-inflicted or not, did not involve an escape or an attempt to do harm to others. No evidence was produced or offered of past conduct that would warrant such a conclusion.

The record shows that the judge had been told by defense counsel that she talked to the defendant after the incident and that he was calm and was prepared to sit quietly at counsel table. Despite that report, the judge did not further investigate the matter or talk to the defendant but, instead, imposed the security restraints.[6]

On this record, perhaps some security restraints were justified. But, the placing of leg irons on the defendant and the

---

[6]The defendant also claims that the security restraints were improper because he was not present at the conference where the judge ordered that the security restraints be imposed. He cites *Commonwealth* v. *Martino*, 412 Mass. 267, 286 (1992), where the court stated, "When a judge conducts an inquiry about a consequential matter . . ., there is a requirement, deriving from the constitutional rights of confrontation and fair trial, that the defendant and his counsel be present." The issue in *Martino* concerned a conference with counsel in regard to a troubled juror. Certainly a conference about the imposition of security restraints is a "consequential matter." Further, in *Commonwealth* v. *Brown*, 364 Mass. at 479, the court stated that the judge should state his reasons for any unusual security measures "in the presence of counsel and defendant." We need not decide whether the absence of the defendant was error, because there is enough on the record to establish that the defendant waived his presence. However, in similar situations, a judge should at least consider the presence of the defendant at such a conference and, if there are serious reasons for the absence of the defendant from the conference, those reasons should be placed on the record.

physical separation of the defendant from his counsel was excessive and, therefore, error.[7]

c. *The judge's instructions to the jury.* The defendant objects to the following portion of the judge's instructions to the jury:

> "I want to point out that there are a couple exhibits, specifically one, the rape kit, that I will not send in with you because of some concerns that I might have, and I think you might have concerning the handling of it. If there are any one of you who feel an overriding need to examine that rape kit, I will provide you with gloves to do so.

> "Also, there are some bags of clothing that appear not to be in issue, the clothing of the complainant . . . . They are safely in plastic bags I'm informed and those will be in with you. If you have an overriding need to open them, once again, let us know and we'll provide you with gloves. I am informed that they are completely safe but I'm not a physician and wouldn't pretend to say whether they are or not."

There was no objection to these instructions.

The complainant's testimony that the defendant informed her, prior to May 17., that he had AIDS was the only evidence introduced at trial regarding the possibility that the defendant might have AIDS. That evidence was important for the Commonwealth because it challenged the consent theory advanced by the defendant. The defendant challenged that evidence by attacking the credibility of the complainant, not only through cross-examination of Commonwealth wit-

---

[7] In *Commonwealth* v. *Brown, supra* at 476, the court stated, "When special restraints are imposed, the judge's charge to the jury should seek to quell prejudice by reasoning and warning against it." Here, the judge's instructions did not mention the special restraints.

There was no objection to the lack of such instruction and, indeed, it may have been waived by defense counsel in an unrecorded charge conference. In any event, appellate counsel did not contend in his brief that the absence of the instruction was error.

nesses, but also by the presentation of defense witnesses who testified concerning the complainant's reputation for truth and veracity in the community.

By saying that he would not be sending certain exhibits, specifically the rape kit, in with the jurors because of some concerns that [he] might have, by his comments as to whether the exhibits of clothing were "safe," and by offering to provide gloves to any juror who wished to examine certain evidence, the judge, in effect, informed the jury that the defendant did indeed have AIDS. "[A] judge may not directly or indirectly express an opinion as to the credibility of particular witnesses." *Commonwealth* v. *Perez*, 390 Mass. 308, 319 (1983). "That is a matter within the exclusive province of the jury." *Ibid.* The judge, by his comments about the providing of gloves, vouched for the credibility of the complainant. Further, the judge's comments exacerbated the risk of prejudice to the defendant, which had not been exorcised due to the failure of the judge to give cautionary instructions when the AIDS subject was first introduced in evidence. See *Wiggins* v. *State*, 554 A.2d 356, 359-362 (Md. 1989) (trial judge committed reversible error in permitting guards to wear rubber gloves during trial of a defendant suspected of having AIDS; reason for guards wearing gloves was left to speculation of jury; jury might infer defendant had AIDS and that inference may prejudice the defendant). "We note . . . that, '[w]here the prejudicial remarks fall from the judge himself, the effect on the jury is likely to be more damaging [than the erroneous admission of testimony]. . . .' " *Commonwealth* v. *D'Agostino*, 421 Mass. 281, 287 (1995) (citations omitted).

2. *Written instructions.* We briefly comment on another issue raised by the defendant concerning the judge's instructions to the jury. The defendant claims that the judge erred when he gave the jury a written copy of his charge. In *Commonwealth* v. *Dilone*, 385 Mass. 281, 287 n.2 (1982), the court stated that "[w]e would endorse any reasonable procedure by which all or portions of a judge's charge agreed to by the parties are made available in writing to a jury."

In *Commonwealth* v. *Lavalley*, 410 Mass. 641, 652 n.15 (1991), the court refined its language in *Dilone*, stating, "While we endorse the use of written instructions if agreed to by the parties . . ., they should be an exact reproduction of the judge's oral charge."

Here, the parties did not agree on the record to the judge's giving written instructions to the jury. Also, the instruction by the judge that he would provide gloves to the jury was not a part of the written instructions given to the jury. By itself, the lack of agreement on the record and the failure to include all of the judge's oral instructions in the written instructions is not reversible error, but it is error.

3. *Conclusion.* We have examined the entire record. We recognize that the case against the defendant was strong. We also are aware that the jury did find the defendant not guilty of one rape. However, the cumulative effect of the several errors leads us to one conclusion — the defendant did not receive a fair trial.[8]

Therefore, the defendant is entitled to a new trial.

*Judgments reversed.*
*Verdicts set aside.*

---

[8]Because of our decision, we need not address other issues raised by the defendant.