COMMONWEALTH vs. EDWARD T. MARTIN.

Berkshire. January 8, 1997. - February 26, 1997.

Present: WILKINS, C.J., O'CONNOR, GREANEY, FRIED, & MARSHALL, JJ.

*Acquired Immunodeficiency Syndrome. Practice, Criminal,* Fair trial, Instructions to jury, Security measures, Presence of defendant. *Rape-Shield Statute.*

At the trial of rape indictments the judge was not required on his own motion to give the jury a limiting instruction with respect to certain correctly admitted evidence suggesting that the defendant was HIV positive, relevant to the issue of the victim's alleged consent; moreover, the judge was not obliged to rule on the truth of the suggestion. [305-306]

At the trial of indictments wherein the judge determined that security precautions were necessary to maintain safety and to prevent a mistrial based on the defendant's disruptive behavior, the defendant did not demonstrate any prejudice from the particular measures the judge imposed. [307-310]

At the trial of rape indictments, certain remarks of the judge to which the defendant did not object, regarding the safety of certain physical exhibits and the availability of gloves for the jurors' use if they should want to examine the exhibits, did not rise to a ground for reversal of the verdicts. [310-311]

At the trial of rape indictments, the judge properly exercised his discretion to exclude as barred by the rape-shield statute, G. L. c. 233, § 21B, proffered evidence raising only a possibility that the victim had engaged in sexual intercourse with some unidentified man other than the defendant at some unspecified earlier time. [312-313]

There was no merit to a defendant's argument on appeal that his defense was prejudiced and a substantial risk of a miscarriage of justice was created by the judge's exclusion of a certain proffered hearsay statement of the rape victim, where the defendant had waived the issue at trial. [313-314]

INDICTMENTS found and returned in the Superior Court Department on May 22, 1991.

The cases were tried before *Charles R. Alberti,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Jack D. Curtiss* for the defendant.

*Eric Neyman,* Assistant District Attorney, for the Commonwealth.

FRIED, J. The defendant was indicted on one indictment charging aggravated rape, two indictments charging rape, one indictment charging assault and battery, and one indictment charging burglary and assault of an occupant in a dwelling. The jury found the defendant guilty on all indictments except one of the rape indictments. The Appeals Court reversed the convictions because of perceived errors and potential prejudice stemming from measures the trial judge took in response to a disturbance created by the defendant and in response to the possibility that the defendant was suffering from acquired immunodeficiency syndrome (AIDS). See *Commonwealth* v. *Martin,* 39 Mass. App. Ct. 658 (1996). We granted the Commonwealth's application for further appellate review. We affirm the judgments of the Superior Court.

I

The victim alleges that in the early morning hours of May 17, 1991, she was assaulted by the defendant in her apartment. According to the victim's testimony, the defendant had been released from jail the previous day and had returned to the town where she lived. The two had had a lengthy relationship prior to the defendant's incarceration. At some time between 1 and 2 A.M. on May 17, the victim returned to her apartment from a bar where she had been since early the previous evening. Hers was a first-floor apartment immediately to the left of the main door of the building. Having let herself into the building and opened her apartment door, the victim heard someone behind her call her name. Immediately thereafter, the defendant put his arms around her, pushing her into the apartment and onto a couch directly in front of the apartment door. He began yelling at her, calling her names, and accused her of going out with other men. His anger rising, he punched her twice, removed her clothing and raped her. The defendant then pulled her down the hallway to her bedroom, where he raped her, performed oral sex on her, and raped her again. The defendant then left the bedroom and the victim put on a T-shirt. As she left the bedroom she encountered the defendant leaving the kitchen from which he had taken a beer. They both went into the living room.

While the two were together in the living room, the door buzzer rang but the defendant ordered her not to answer it. The victim testified that she was afraid to move for fear the

defendant would seriously harm her. When the buzzer rang again at 7 A.M., the victim told the defendant that she thought her children were at the door and the defendant allowed her to answer it. Dressed in a T-shirt with a blanket wrapped around her waist, she opened the door to find a friend, Robert Hoover, at the main door. She showed him her injuries, whispering, "Eddie got out and he's in there." With Hoover's assistance, the victim pushed the door open and ran to the apartment of another friend, Carol Grimm. From this location the victim called the police and told Grimm that she had been beaten. When the police arrived the victim told them that she had been beaten and raped. The police noted bruises on her forehead and swelling on her head. The police took the victim to a hospital where a full examination using a rape kit was performed. She told the treating physician that she had been beaten, punched about the face, and choked, and received treatment for bruising and swelling about her head and neck. At trial, the physician testified that the victim's injuries were consistent with her having been beaten. During the time the victim spent at the hospital, several officers went to the victim's apartment where they found the defendant asleep in the bedroom and arrested him.

Although one witness at trial testified to an earlier conversation with the victim in which the victim had said she loved the defendant and he would be staying with her following his release from jail, the victim testified that she would not have consented to intercourse with the defendant because he had informed her previously that he had tested positive for AIDS. The victim testified that she had planned to be out of town when the defendant was released from custody but he had been released earlier than she had expected. She testified that she was frightened of the defendant and terrified that as a result of the forced intercourse she would contract AIDS and die.

Two witnesses for the defendant testified that the victim's reputation in the community for veracity was bad. Another witness testified that she lived next door to the victim and that during the early hours of the morning in question, she had heard nothing out of the ordinary through the wall she shared with the victim's bedroom.

As we recount in greater detail below, following a lunch break during the second day of the trial, a court officer

reported that the defendant was acting up and had injured himself. At a lobby conference, the parties agreed to adjourn for the day. The next morning, the judge ordered a number of additional security measures which are the subject of this appeal. Following trial, the jury convicted the defendant of four of the five indictments. The Appeals Court reversed the judgments and set aside the verdicts on three grounds: (1) Although the trial judge acted within his discretion in admitting in evidence the victim's statements that the defendant had told her he had tested positive for AIDS, the judge should have given the jury a cautionary instruction "to minimize or possibly to dissipate the prejudice or fear likely to arise from the testimony." *Commonwealth* v. *Martin,* 39 Mass. App. Ct. 658, 664 (1996). The defendant had not requested such a cautionary instruction. (2) The security measures were excessive and, in light of what the Appeals Court termed "the AIDS issues," were especially prejudicial. That court concluded that "[o]n this record, perhaps some security restraints were justified. But, the placing of leg irons on the defendant and the physical separation of the defendant from his counsel was excessive and, therefore, error." *Id.* at 668-669. The court also observed that the judge's instructions to the jury did not mention the special restraints, although this court had stated in *Commonwealth* v. *Brown,* 364 Mass. 471, 476 (1973), that "[w]hen special restraints are imposed, the judge's charge to the jury should seek to quell prejudice by reasoning and warning against it." See *Commonwealth* v. *Martin, supra* at 669 n.7. (3) At the close of trial, the judge told the jury that he would not send the rape kit and the bags of clothing into the jury room unless the jury requested them, and that in that case he would provide the jury with gloves to handle this material. The Appeals Court found that these remarks were prejudicial and improperly supported the victim's testimony that the defendant had AIDS. *Id.* at 670.

The Appeals Court concluded that "the case against the defendant was strong. We are also aware that the jury did find the defendant not guilty of one rape. However, the cumulative effect of the several errors lead us to one conclusion — the defendant did not receive a fair trial." *Id.* at 671.

## II

What the Appeals Court called the AIDS issues are the

crux of this case. We agree that the widespread ignorance about the nature of this disease and the accompanying prejudices against persons suffering from it or, as here, merely alleged to suffer from it, pose dangers to the accuracy and fairness of the legal process in many ways. See Court Management Issues and Guidelines, AIDS and the Courts 189 (1990); National Judicial College & ABA AIDS Benchbook (1991). The Appeals Court was also correct in insisting that trial judges be alert to these dangers and take appropriate measures to guard against them. We are not persuaded, however, that these dangers are so distinct and so much more acute than other threats to fairness and accuracy that special presumptions or per se rules need to be imposed. It has not been shown that the usual techniques for overcoming or minimizing bias and prejudice, sensitively and appropriately deployed, are insufficient. Nor are we willing to reverse convictions which we do not believe are unfair or the product of prejudice, simply because some actions of the particular trial judge may show signs of the misconceptions and a potential overreaction against which it is important to guard.

A

The victim testified that, while he was in jail, the defendant had informed her that he had tested positive for human immunodeficiency virus (HIV). The defendant argues that the judge should have excluded this testimony because it was unduly prejudicial. In the alternative, he argues that the judge should have made efforts to determine if the defendant did in fact have AIDS, and, if the testimony was to be admitted, should only have admitted the testimony accompanied by a cautionary instruction. Despite defense counsel's vigorous objections at trial to this portion of the victim's testimony, the judge was correct in admitting it. Although the defense raised some issues as to whether the defendant had engaged in intercourse with the victim at all, the focus of the defense from opening argument onward centered on consent. The defense emphasized the parties' relationship prior to the defendant's incarceration and testimony that the victim said she loved the defendant and expected to resume her relationship with ḥim. In that context, the victim's account of the defendant's purported contraction of AIDS and her testimony that she was "terrified" of contracting AIDS was highly rele-

vant to confirming her claim that she had not consented to intercourse with the defendant. The Appeals Court agreed, but thought that a cautionary instruction was required. None was given.

But none was requested. "Ordinarily judges are not required, sua sponte, to instruct the juries as to the purposes for which evidence is offered at trial." *Commonwealth* v. *Booker*, 386 Mass. 466, 472 (1982), quoting *Commonwealth* v. *Roberts*, 378 Mass. 116, 126 (1979). There are good reasons for this. In the absence of a palpable danger of a miscarriage of justice in a particular case, the adversary system depends on the initiative and strategic sense of defense counsel to elicit such a protective measure from the court. In respect to the AIDS testimony there is particular reason for leaving the matter to defense counsel's initiative. Having failed to keep the testimony out, defense counsel might well have concluded that matters would only be made worse by the giving of such a "children, don't put beans up your nose" instruction. See *Commonwealth* v. *Clark*, 20 Mass. App. Ct. 392, 396 (1985) (defense counsel may determine that judge's charge would have undesirably focused attention on specific evidence). The same is true of the defendant's claim that the judge should, as a precondition of the testimony's admissibility, have determined whether the defendant did, in fact, have AIDS. The defendant requested no such determination at trial, nor did he seek to introduce evidence that he was not infected.[1] Of course one reason defense counsel might not wish independent evidence on this score is that the statement might be true. The decision to take a step that might prove devastating should, and does, rest with defense counsel.[2]

---

[1] If the AIDS issue came as a surprise in the midst of the trial, which does not appear likely, defense counsel might have sought a continuance to obtain such rebutting testimony if none was then available.

[2] We reach the same conclusion in regard to requiring a voir dire into the jurors' attitudes to AIDS at the time of jury selection. In this case it was not apparent to the judge at the time of jury selection that AIDS would be an issue in the case. The ABA guidelines referred to by the defendant state that "[w]here, in a jury trial, the defendant's HIV status may become an issue in the case, the court should permit or conduct a full voir dire on the issue. If the defendant's status has been publicized or is apparent, at the request of the defendant, the court should permit or conduct a full voir dire on the issue." National Judicial College & ABA AIDS Benchbook 21 (1991).

## B

We agree with the Appeals Court that the judge appears to have overreacted to a report received from the court officer that, in the judge's words, the defendant "has been acting up during the lunch hour in some manner, and he had indicated to [the court officer] that he did not want to come back in the courtroom. As a matter of fact . . . the only way he would come out would be dead." It appears that the defendant was upset by the way things were proceeding at his trial and it also appears that the defendant cut his hand — the judge inferring from the report that the defendant had cut himself intentionally. The court officer's report had concluded by stating, "I feel Mr. Martin was planning an escape, and using his blood as a weapon." It was in response to this report and the defendant's behavior outside the courtroom that the judge became concerned for the safety of other individuals within the courtroom and ordered security precautions in the form of the leg irons, some degree of separation between the defendant and counsel, and the stationing of court officers behind and beside the defendant. The defendant contends, and the Appeals Court agreed, that these precautions were excessive.

In *Commonwealth* v. *Brown*, 364 Mass. 471 (1973), on which the defendant places principal reliance, the defendants, who were inmates accused of assaulting a correction officer, were restrained with their handcuffs attached to waist belts. Some jurors had an opportunity to observe the defendants in shackles before they entered the courtroom, and the defense witnesses, who were also inmates, each wore handcuffs. This court affirmed the convictions in that case:

> "When special restraints are imposed, the judge's charge to the jury should seek to quell prejudice by reasoning and warning against it. Fair trial by an impartial jury is not denied when the relevant factors are weighed to a sensible conclusion that safeguards are needed which, in the circumstances of the content and conduct of the case, will not bring the rationality of the process or its decorum below an acceptable level. The burden is on a defendant to show that the judge's decision in the matter was wrong, and an appellate court, acknowledging that the judge has a range of discretion, will not reverse his decision and vacate a conviction unless he is

shown to have been arbitrary or unreasonable." (Footnote omitted.)

*Id.* at 476. But we went on to say that "changes are needed," *id.* at 479, because of the "inadequate . . . procedure often followed in dealing with the issue of security at trial," *id.* at 478, specifically noting problems which arise if there is no record denoting the judge's reasons for implementing security measures and the facts buttressing the judge's reasoning. Addressing this problem, we concluded:

> "It should be possible in some cases at least for the prosecution, the defence, and the custodial authority, without participation by the judge, to consider and agree in advance on any unusual security measures that need to be taken during trial. In the absence of agreement, we think that a judge who contemplates approving such measures should state his reasons (including recommendations received from the custodial authority) in the presence of counsel and defendant, and out of the presence of veniremen or jury, and provide an opportunity for counsel to make their objections known. If fact questions arise, they should be thrashed out. The hearing may be informal, and ordinary rules of admissibility need not be observed, but a record should be made." (Footnote omitted.)

*Id.* at 479.

We do not retreat from that conclusion, but decline to treat it as a rigid legislative formulation, any deviation from which must result in reversal. In this case the judge held the recommended hearing with both the prosecutor and defense counsel and the record certainly reflects his reasoning and counsel's objections. The only deviation from the recommended procedure was the defendant's absence. We agree with the defendant that he has a right to be present at every consequential stage of the proceedings, *Commonwealth* v. *Martino*, 412 Mass. 267, 286 (1992), and we assume arguendo that this may be such a stage. But just as in *Martino*, "[t]he absence of the defendant from such a colloquy, . . . does not automatically constitute reversible error." *Id.* Even the Appeals Court noted that "there [was] enough on the record to establish that

the defendant waived his presence." *Commonwealth* v. *Martin, supra* at 668 n.6. See *Commonwealth* v. *Rios,* 412 Mass. 208, 212 (1992) (defendant's voluntary conduct can lead to defendant's exclusion from trial), citing *Commonwealth* v. *Chubbuck,* 384 Mass. 746, 751 (1981). It was a serious disruption of the defendant's own making which caused the trial to be adjourned early on the second day and created the need for a conference regarding security measures. Defense counsel herself had asked for the early adjournment so that she could talk with the defendant "in a more calm and rational situation." Reviewing the situation the following morning, the judge determined security precautions were necessary to maintain safety and prevent a mistrial. Defense counsel vigorously opposed the security measures and the reasons for them, and reported the substance of the hearing to the defendant, who she said understood them. She did not insist — or even suggest — that the defendant be present and heard on the matter. On the contrary, she acknowledged the defendant's misbehavior the previous day, his tendency to be distraught and angered over the pending allegations, and after concluding the lobby conference, asked for some time to meet with her client "to get over the anger part." On her return, she noted that the defendant was "very upset" and, for the sake of the record, reported that he was "fairly uncooperative" and "marginally refusing to speak" with his counsel. See *Commonwealth* v. *Martino, supra* at 286-287 (no reversible error where all discussions were recorded, defendant was fully informed, and no objection was raised to the procedure the judge employed).

It remains to consider the substance of the matter: Was the defendant prejudiced by the security measures? We think he was not. This case is very different from *Commonwealth* v. *Brown,* 364 Mass. 471 (1973). In *Brown* the precautions taken were obvious and apparent. Here the judge sought to ensure that the jury would not even be aware of the security measures. In imposing a degree of physical separation between the defendant and his counsel,[3] the judge ordered that the space between them be occupied by law books, so it would appear that the space was provided to accommodate defense

---

[3]As defense counsel sat closest to the defendant, the judge ordered this separation in order to protect defense counsel from any outbursts or threat of harm that might arise.

counsel's materials. During the trial, defense counsel made no claim that this extra distance impeded her ability to consult with her client. As to the leg irons, while such "unusual security measures are . . . to be avoided if possible," *Commonwealth* v. *Brown, supra* at 475, the judge specifically sought to avert any prejudice that might come from such devices by directing the defendant's legs to be covered by a blanket so that the irons would not be visible to the jury. To be sure, at the outset counsel objected that this precaution was insufficient because the jury would hear the irons when defendant moved. But this concern does not constitute evidence that there was, in fact, any occasion in which such a noticeable noise was made in the hearing of the jury. Had there been such an identifiable noise, counsel could have approached the bench and objected or sought a mistrial. And, of course, the absence of a cautionary instruction is quite beside the point — and the defendant does not complain on that score — because such an instruction would have drawn attention to the very precautions the judge and the defendant sought to keep from the jury.[4]

C

Finally, the defendant objects to some general remarks the judge made regarding exhibits before he gave his actual instructions to the jury:

> "I want to point out that there are a couple exhibits, specifically one, the rape kit, that I will not send in with you because of some concerns that I might have, and I think you might have concerning the handling of it. If

---

[4]The judge's decision to have one officer sit beside and one behind the defendant "as unobtrusively as possible" was sufficiently within his discretion and of sufficiently marginal concern as to raise no separate ground for reversal. We note that defense counsel raised no objection on this score. Indeed, it appears that one officer, Detective Beals, had already been sitting behind the defendant with the jury's knowledge. The most that can be said is that this was part of the judge's overreaction to the court officer's report that the defendant might be planning an escape. As we have said, such an overreaction would only be relevant at this stage if it had somehow prejudiced the defendant. Since there was no claim that the jurors actually were aware of the precautions — only that they might be — and since the judge had taken steps to minimize the risk of such awareness, the seating of the officers is not sufficient either alone or cumulatively to show such prejudice as requires reversal.

there are any one of you who feel an overriding need to examine that rape kit, I will provide you with gloves to do so.

"Also, there are some bags of clothing that appear not to be in issue, the clothing of the complainant . . . . They are safely in plastic bags I'm informed and those will be in with you. If you have an overriding need to open them, once again, let us know and we'll provide you with gloves. I am informed that they are completely safe but I'm not a physician and wouldn't pretend to say whether they are or not."

The defendant offered no objection to these statements at the time they were made. He now argues that these statements exacerbated the prejudice that might arise from the victim's testimony regarding the defendant's prior statement that he had AIDS and that the judge invaded the province of the jury by implicitly vouching for the victim's credibility. In evaluating this claim it is important to recall that the rape kit included laboratory items, which — like the bags of clothing — were unlikely to be of much help to the jurors in their deliberations. The implication the defendant now draws from the judge's remarks does not rise to a ground for reversal, especially in the absence of an objection.

Finally, in respect to all of these grounds, separately or cumulatively, it must be remembered that the judge instructed the jury that "[y]ou are to decide what the facts are solely from the evidence admitted in this case, and not from suspicion or conjecture," cautioning the jurors that his instructions or "anything [he might] have said in passing during the trial are not evidence." The judge's instructions, in addition to being delivered orally, were provided to each of the jurors in writing.[5]

---

[5]The defendant complains that it somehow compromised his rights to a fair trial under art. 12 of the Massachusetts Declaration of Rights to supply the jurors with written instructions. As he concedes, there is no authority for this complaint in our decisions, see *Commonwealth* v. *Lavalley*, 410 Mass. 641, 652 n.15 (1991) (endorsing use of written instructions if parties agree); *Commonwealth* v. *Dilone*, 385 Mass. 281, 287 n.2 (1982) (endorsing "any reasonable procedure" by which instructions are made available in writing to jury), and a "comparatively large number of courts favor the

## III

The defendant complains that the judge improperly limited certain testimony and excluded certain items of evidence. This evidence, he contends, might have given weight to the claim defense counsel argued before the jury that the victim had been beaten by another man other than the defendant. This theory came from testimony of a defense witness, the victim's neighbor, Renee DiFilippo, who said she saw the victim with another man some hours before the victim encountered the defendant. In support of this contention, through questioning, the defendant sought to elicit testimony from the forensic serologist that at least some semen stains on the victim's bedspread did not belong to the defendant.[6]

The judge interposed the rape-shield statute, G. L. c. 233, § 21B, to exclude this line of inquiry. The rape-shield statute is intended to preclude testimony about a victim's sexual conduct except "evidence of recent conduct of the victim alleged to be the cause of any physical feature, characteristic or condition of the victim," which may be admissible. The defendant theorized that the evidence would support his contention that another man had engaged in intercourse with the victim and had beaten her. At the preliminary hearing

sending of written instructions with juries while a few jurisdictions deem it error." Moreover, Rule 8A of the Rules of the Superior Court (1996) and our decision in *Commonwealth* v. *St. Germain,* 381 Mass. 256, 265-266 (1980), provide that the judge in his discretion may allow jurors to take notes during the trial, argument, and court instruction. Far from contributing to the doubt that defendant seeks to cast on this practice, we reiterate our approval of it.

The Appeals Court found error, though not reversible error, in this regard because "the parties did not agree on the record to the judge's giving written instructions to the jury. Also, the instruction by the judge that he would provide gloves to the jury was not a part of the written instructions given to the jury." *Commonwealth* v. *Martin,* 39 Mass. App. Ct. 658, 671 (1996). In this court appellate counsel does not rely on these grounds of error, acknowledging that "[t]his procedure was done with the concurrence of defense counsel and the prosecution. The written instructions were verbatim of the court's oral instructions." We commend appellate counsel for his scrupulous regard of his duty to be candid with this court in this, as throughout his presentation.

[6]The swabbings taken by the serologist indicated that the semen in the victim's vagina was of the same blood group as the defendant's, but testing could not establish if it was of the same subtype (PGM) as the defendant's. The defendant's blood type was also consistent with seminal fluid found on the victim's clothing, bedsheet, and a number of the stains on the bedspread.

required by § 21B, the judge excluded the testimony, noted above, on the ground that defendant offered no "particularity as to the time-frame of prior act or identity of prior actor" to serve as the basis for his contention that the stains were evidence of "recent conduct of the victim." That the proffered evidence would suggest no more than the possibility that the victim had engaged in intercourse with some man other than the defendant, at some time in the past, is exactly the type of speculation the statute is intended to preclude. *Commonwealth v. Chretien,* 383 Mass. 123, 137-138 (1981). The defense later presented DiFilippo's testimony that she had seen the victim with another man earlier in the evening before the victim's encounter with the defendant. We acknowledge that there is some connection between DiFilippo's testimony and the forensic evidence which the judge found to be precluded by § 21B, but it was within the discretion the statute accords to the judge in such cases to rule that there was not sufficient particularity and showing of recency to lift the barrier of the statute. See *Commonwealth* v. *Mosby,* 11 Mass. App. Ct. 1, 14 (1980).

The defendant also complains that the judge erred in limiting his examination of DiFilippo. DiFilippo testified that she had seen the victim outside her apartment window at approximately 11 P.M. with a man other than the defendant, that the victim seemed agitated, and that she seemed to be "having a little bit of a problem" with this man. The defendant contends that DiFilippo should have been allowed to testify that the victim was intoxicated and had told DiFilippo that she was going out to "look for a fight." The victim had previously testified that she had not had an argument with anyone or a fight on the evening in question. The defendant now argues that DiFilippo's testimony as to the victim's remark, though hearsay, should have been admitted as an inconsistent statement to cast doubt on that portion of the victim's testimony. Although one can argue whether the hearsay statement was inconsistent with the victim's testimony that she had not been in a fight before encountering the defendant, the point is entirely moot. The defendant concedes in his brief to this court that "defense counsel waived inquiry into [the victim's statement that she had not been in a fight]

because of the hearsay rule." The record bears that out.[7] There was no joinder on the issue of using this statement for the purposes of impeaching the victim's testimony. At most, the colloquy between counsel and the court suggests that defense counsel may have been discouraged from attempting to use the testimony. In this court, therefore, the defendant is remitted to arguing that the absence of this testimony further compromised the defendant's ability to present his defense, and with other errors resulted in a substantial risk of a miscarriage of justice. Not only do we find no such substantial errors, but the suggestion that the jury may have been so prejudiced against defendant that they might not consider the case fairly is contradicted to some extent by the fact that the jury were willing to distinguish between the three indictments charging rape and find the defendant not guilty of one of them.

The judgments of the Superior Court are affirmed.

*So ordered.*

---

[7]At side bar defense counsel concludes the discussion on this point with the remark: "It's very difficult, as you know, to explain to a witness without telling them what to say. I have told [DiFilippo] what hearsay is, and I told her that she cannot say what [the victim] told her."